### STATE OF IOWA v. B. F. BOOMER, Appellant.

**Fraudulent Banking.** A bank which is still receiving deposits, although most of its business has been transferred to another bank, is within Acts Eighteenth General Assembly, chapter 153, making it a felony for any officer of a bank to knowingly receive any deposits when the bank is to his knowledge insolvent.

EVIDENCE. Papers used in another action tending to show by defendant's admission that he was sole owner of a bank are admissible in evidence in a prosecution for knowingly receiving money on deposit in such bank, while it was insolvent.

SECONDARY EVIDENCE. On a trial for fraudulent banking, where the books of defendant's bank are in his possession, and he cannot be required to produce them, witnesses that have been employed by defendant and have become familiar with the books in the course of their employment, may testify as to their contents.

OPINION EVIDENCE. Such witnesses, being familiar with the banking business, the bank books, and the value of the property then owned by defendant could state their opinions as to defendant's solvency when the deposit in question was received.

PUNISHMENT. Under Acts Eighteenth General Assembly, chapter 153, section 2, making it a felony for an insolvent bank to receive a deposit, a judgment of conviction requiring defendant to be imprisoned in the penitentiary, at hard labor, for the term of five years, as is not reversible for being excessive punishment.

**Indictment:** VARIANCE IN PROOF. Acts Eighteenth General Assembly, chapter 153, section 1, provides that no insolvent bank shall receive on deposit moneys or currency "or other notes, bills, or drafts circulating as money or currency." Code 1873, section 4306, provides that no indictment shall be held insufficient for surplusage where there is sufficient matter alleged to indicate clearly the offense and the person charged, or for any matter which does not tend to the prejudice of the substantial rights of defendant, on the merits. An indictment for receiving a deposit after known insolvency charged that the deposit was "in lawful money of the United States, a particular description of which to the jurors is unknown." The evidence given by the clerk who received the deposit was that it was currency, but that he did not notice whether it was national currency, greenbacks, silver certificates, or gold certificates. *Held*, that the words "of the United States" could be rejected as surplusage, and hence there was no material variance.

TIME DEPOSIT. A deposit payable after a stated time, with interest, is within the statute against fraudulent banking.

DOCUMENTARY EVIDENCE. Documentary evidence which was before the grand jury need not be returned with the indictment or be noted thereon.

NOTICE OF WITNESSES. A notice served on defendant in a prosecution for knowingly receiving a deposit while a bank owned by him was insolvent, stating that the clerk of the district court would be examined as a witness, and that it was expected to prove by him that he was such clerk, and that as such he had the custody of the records of the court and would introduce and identify its records, showing a specified list of judgments, is sufficient to authorize the examination of such clerk and identification by him of papers in a case to which defendant has been a party, tending to show that he was the owner of the bank.

*Appeal from Allamakee District Court.*—HON. A. N. HOBSON, Judge.

SATURDAY, OCTOBER 9, 1897.

THE defendant was accused and convicted of the crime of fraudulent banking, and from the judgment, which required that he be imprisoned in the penitentiary at Anamosa at hard labor for the term of five years, he appeals.—*Affirmed.*

*Dayton & Dayton, Stilwell & Stewart,* and *H. T. Reed* for appellant.

*Milton Remley,* attorney general, *E. M. Woodward,* county attorney, and *J. H. Trewin* for the state.

ROBINSON, J. — The indictment charges "that said B. F. Boomer, at the county of Allamakee, state of Iowa, on or about the fifteenth day of August, 1893, was engaged in the banking business at Waukon, in said county and state, under the name and style 'Bank of Waukon, Boomer Bros.,' and he, the said B. F. Boomer, the Bank of Waukon, and Boomer Bros., were then and there insolvent; and while and when he, the said B. F. Boomer, the Bank of Waukon, and Boomer Bros., were so insolvent, and while and when he, the said B. F. Boomer, was so engaged in the banking business at the time and place aforesaid, he, the said B. F. Boomer, then and there being president and manager of said Bank of Waukon, did, knowing of such insolvency as aforesaid, knowingly and unlawfully receive on deposit in said Bank of Waukon, from one Michael Regan, the sum of two hundred dollars, in lawful money of the United States, a particular description of which is to the grand jurors unknown, contrary to and in violation of the laws of the state of Iowa." The evidence authorized the jury to find that the following were established facts: In the year 1878 the defendant and his brother, J. H. Boomer, commenced the banking business at Waukon, under the name of the "Bank of Waukon, Boomer Bros." The capital of the bank belonged to the defendant, but his brother, who acted as cashier, was to have one-half of the profits of the business after paying the defendant interest on one-half of the capital. In the year 1891, J. H. Boomer moved to South Dakota, and does not appear to have had any interest in the

bank after that time, although his name continued to appear as cashier. The bank was carried on thereafter by the defendant, but without any change in the name. He did not personally keep the books of the bank, but was advised as to its condition. In addition to the banking business, he was engaged in buying and selling live stock. In the spring of the year 1893, the First National Bank of Waukon was organized, and in June commenced doing business; and the defendant became the owner of a part of its capital stock, and arranged to transfer to it the banking part of his business. The business of both banks was thereafter carried on in the same room, the defendant using the back part of it for the Bank of Waukon and for his stock business. Nearly all of the banking business was, in fact, transferred to the First National Bank; and the defendant insists that he had ceased to do a banking business at the time the transaction for which he was indicted took place. But it is shown that the Bank of Waukon continued to receive occasional deposits. On the fifteenth day of August, 1893, that bank received from Michael Regan two hundred dollars in money, and gave to him a certificate, of which the following is a copy:

"Bank of Waukon,
"Boomer Brothers,
"Waukon, Iowa, Aug. 15, 1893.

"Michael Regan has deposited in this bank two hundred dollars, payable to the order of himself in current funds on the return of this certificate properly indorsed, 12 months after date, with interest at 5 per cent. per annum for the time specified only.

"Matures 8, 15, '94.
"J. H. Boomer, Cashier."

Within a week after that time, the defendant gave mortgages and transferred property to a large amount for the purpose of securing debts, and the Bank of Waukon was closed.

The state claims that the money was received from Regan in violation of chapter 153 of the Acts of the Eighteenth General Assembly, which contains the following:

"Section 1. No bank, banking house, exchange broker, deposit office, or firm, company, corporation, or party engaged in the banking, broker, exchange, or deposit business, shall accept or receive on deposit, with or without interest, any moneys, bank bills or notes, or United States treasury notes, or currency or other notes, bills or drafts circulating as money or currency, when such bank, banking house, exchange broker, or deposit office, firm or party is insolvent.

"Sec. 2. If any such bank, banking house, exchange broker, or deposit office, firm, company, corporation, or party, shall receive or accept on deposit any such deposits aforesaid, when insolvent, any officer, director, cashier, manager, member, party, or managing party thereof, knowing of such insolvency, who shall knowingly receive or accept, be accessory, or permit or connive at the receiving or accepting on deposit therein, or thereby, any such deposits as aforesaid, shall be guilty of a felony.   *   *   *"

I. At the close of the evidence, the defendant asked the court to direct a verdict of not guilty on several grounds, one of which was that there was a material variance between the indictment and the proofs. The alleged variance was as follows: The indictment charges that the deposit in question was "in lawful money of the United States, a particular description of which is to the grand jurors unknown", while the proof failed to show that it was in coin of the United States or notes or certificates which it was required to redeem. The testimony of the employe who received the deposit was that it was two hundred dollars; that it was currency, but that he did not notice "whether it was national currency or greenbacks or

silver certificates"; that there "might have been a gold
certificate." It is not claimed that, to constitute the
offense of fraudulent banking by receiving a deposit
when the bank or person receiving it is insolvent, it is
essential that the deposit consist of money issued by
the United States. The language of the statute cited
leaves no room for such a claim, but includes "all cur-
rency or other notes, bills or drafts circulating as money
or currency." The claim is that the proof must conform
strictly to the charge, even though that be made with
unnecessary particularity. There are undoubtedly
many decisions which tend to sustain that claim. 1
Greenleaf, Evidence, section 65. In *State v. Newland*,
7 Iowa, 242, the indictment charged that the defendant
passed counterfeit bills which purported to have been
issued by "a corporation duly authorized for that pur-
pose, by the state of Massachusetts"; and it was held
incumbent on the state to prove that averment. So, in
*State v. Crogan*, 8 Iowa, 523, where the indictment
charged that the defendant kept a place resorted to
for the purpose of gambling, in a building on a lot speci-
fied, it was held that, although it was unnecessary to
have described the location of the place further than to
show the proper venue, yet, as it was more specifically
described, the proof must show that the place was on
the lot specified. Those cases did not arise under the
statutes which govern this case. Section 4305 of the
Code of 1873 provides that an indictment "is sufficient
if it can be understood therefrom:   *   *   *   (5) That
the act or omission charged as the offense, is stated
with such a degree of certainty, in ordinary and concise
language, and in such a manner as to enable a person of
common understanding to know what is intended, and
the court to pronounce judgment upon a conviction
according to the law of the case." Section 4306 provides
that "no indictment is insufficient, nor can the trial,

judgment, or other proceedings thereon be affected by reason of any of the following matters:   *   *   *   (4) For any surplusage or repugnant allegation, or for any repetition, when there is sufficient matter alleged to indicate clearly the offense and the person charged; nor (5) for any other matter which was formerly deemed a defect or imperfection, but which does not tend to the prejudice of the substantial rights of the defendant upon the merits." The case of *State v. Hesner*, 55 Iowa, 494, arose under those statutes, and is especially relied upon by the appellant. In that case the indictment charged the defendant with the crime of selling intoxicating liquor known as "whisky," in violation of law; and it was held that an instruction which authorized a conviction on proof of the sale of intoxicating liquors other than whisky was erroneous. But the charge that the defendant was guilty of selling whisky illegally was so specific and definite as to be well calculated to exclude, by implication, illegal sales of other liquors, and thus mislead the defendant, to his injury, in the preparation of his defense. That case is so unlike this in important particulars as not to be in point. The deposits which the statute which creates the offense of fraudulent banking is designed to prevent are of any kind of money, bank bills, or notes, treasury notes issued by the United States, currency, or other notes, and bills or drafts circulating as money or currency; and it is wholly immaterial whether the deposit be of money issued by the general government or not. The statute does not specify "lawful money of the United States." In a general sense, such money is any lawful money which is circulated in the United States. In a comprehensive sense, money is "any currency usually and lawfully employed in buying and selling." Webster Inter. Dictionary. It includes "whatever is lawfully and actually current in buying and selling, of

the value and as the equivalent of coin." 15 Am. & Eng. Enc. Law, 701. See, also, *Klauber v. Biggerstaff*, 47 Wis. 557 (3 N. W. Rep. 357). In view of the purposes of the statute, and the popular understanding of the term "lawful money," and the absence of any more definite designation than "lawful money of the United States," we conclude that the indictment was designed to include any money which was lawfully circulated in the United States; and hence that the words "of the United States" may be rejected as surplusage. Had the indictment charged that the deposit was of money particularly described, as of gold coin, or of treasury notes of a particular denomination and number, it may be that no part of the description could have been rejected as surplusage, and that the case would have been within the rule of *State v. Hesner, supra.* For the reasons shown, we are of the opinion that there was no variance in proof which was prejudicial to the defendant. See *State v. Ean*, 90 Iowa, 536; *Tracy v. State*, 46 Neb. 361 (64 N. W. Rep. 1071).

II. The defendant claims that the evidence did not show that he was engaged in the banking business when the transaction in question occurred. It shows that nearly all the banking business, such as making loans, discounting notes, selling exchange, and making collections, had been transferred to the First National Bank of Waukon before that time; but the bank of Waukon had continued to receive deposits, and had not therefore fully closed its banking business and was doing that business, within the meaning of the statute, when it received the deposit in question. Nor can we say that transaction was not a deposit, within the

meaning of the statute, but a mere loan of money. *State v. Cadwell*, 79 Iowa, 434. The statute contemplates time deposits, for it includes deposits on which interest is paid. The certificate given to Regan shows that the transaction was a time deposit, and the evidence justified the jury in so finding, and in finding that the deposit was received by authority of the defendant, expressly given.

III. The defendant complains because the district court permitted witnesses Hager and Mitchell, who had examined the books of the Bank of Waukon, to testify as to their contents. The witnesses had been employed by that bank, and had become familiar with the books in the course of their employment. The books were in the possession of the defendant, and he did not produce them. It is not claimed that he could be compelled to do so. Constitution Iowa, article 1, section 8; Code 1873, section 3636; *Boyd v. U. S.*, 116 U. S. 616 (6 Sup. Ct. Rep. 524); *Counselman v. Hitchcock*, 142 U. S. 547 (12 Sup. Ct. Rep. 195). But it is said the state cannot be permitted to do indirectly what it can not do directly, and substitute secondary evidence for that to which it is not entitled. We do not think that objection, as applied to the facts in this case, is well founded. The witnesses became familiar with the contents of the books in question, with the knowledge and consent of the defendant; and proof of the information they thus obtained is as competent for the state, in the absence of the books, as would be proof of declarations the defendant had made. It was the best evidence which could be obtained without the consent of the defendant, and the state should not be debarred from its use merely because the defendant might be regarded as admitting it to be true if he did not introduce the books to disprove it. The same

result would follow his failure to contradict as a witness declarations which the evidence tended to show he had made.

IV. The defendant also complains because Hager and Mitchell were permitted to state their opinions, based on their knowledge of the books they had examined, as to the solvency of the defendant when the deposit in question was received. The witnesses were familiar with the banking business, understood bank books, and had a knowledge of the value of the property then owned by the defendant. Their testimony to which the defendant objects was fully authorized by what we said of similar testimony in *State v. Cadwell, supra.*

V. The state was permitted to introduce as a witness the clerk of the district court, who testified to his official position, and identified certain papers in a case to which the defendant had been a party, which were then introduced in evidence. The papers which were thus received tended to show by the admission of the defendant that he was the sole owner of the Bank of Waukon, and were competent for that purpose. But the defendant objects to them, on the ground that the clerk was not examined before the grand jury, his name was not indorsed on the indictment, and notice was not given to the defendant of an intention to examine the witness with reference to the papers introduced. A notice was in fact duly served upon the defendant, which informed him that the clerk of the district court would be examined as a witness, by whom "it was expected to prove that said witness is such clerk; that, as such, he has the custody of the records of said court, and will introduce and identify the records of said court showing the following judgments against the defendant,"—giving a list of judgments. This notice was sufficient, under section 4421 of the Code, to authorize all the evidence which

the witness gave. That section provides that the notice which must be given of the testimony of a witness who was not examined before the grand jury shall state the substance of what is expected to be proven by him on the trial. Notice of what is expected to be proven by documentary evidence is not required. *State v. Farrington*, 90 Iowa, 681. This rule is in harmony with that applicable to the return of evidence taken before the grand jury. It is not necessary to return with the indictment documentary evidence which was before the grand jury, nor is it required that such evidence be noted. *State v. Mullenhoff*, 74 Iowa, 274. The purpose of returning with the indictment minutes of the evidence taken before the grand jury is the same as that of giving notice of the examination of a witness who did not testify before the grand jury. *State v. Yetzer*, 97 Iowa, 423. It has been held frequently that the examination of witnesses who testified before the grand jury need not be confined strictly to the matter set out in the minutes of the testimony. *State v. Harlan*, 98 Iowa, 458, and cases therein cited. And the same rule is applicable to the examination of witnesses who were not before the grand jury, but testify on notice. *State v. Yetzer, supra*. The examination of the clerk was confined to a statement of his official position, and an identification of the documentary evidence introduced, and the notice under the authorities cited, was sufficient to authorize that examination. Notice of the pleadings and judgment entries was not required.

VI. The defendant complains of the refusal of the court to give instructions asked by him, and of portions of the charge given. The first four instructions asked by the defendant and refused, were in conflict with the law as we have stated it, and with the facts as the jury was authorized to find them, and therefore

were properly refused. So far as the instructions asked were material and correct, they were virtually included in the charge as given. That, in the particulars of which the defendant complains relating to the meaning of the word "insolvent," as used in the statute, was substantially the same as the portion of the charge approved in the case of *State v. Cadwell, supra.* It is true this case differs from that in that the defendant had ceased to transact a full banking business when he received the deposit in question, and that the charge of the court did not recognize that difference, but the omission to do so could not have prejudiced the defendant. The charge as given was applicable to the facts in this case.

VII. It is claimed that attorneys for the state were guilty of misconduct during the trial in asking questions relating to the books of the defendant, in bringing them to the attention of the jury after the court had ruled that such references were improper, and in other matters. We cannot say that there was error in anything of which complaint is thus made. Some of the things said by attorneys, and now objected to, were authorized by the record. It appears from a statement made by the court that an attorney for the defendant had at some time during the trial suggested that the defendant had not refused to produce his books; and we cannot say that the court abused its discretion in permitting what was done, nor that the attorneys for the state were guilty of misconduct.

VIII. We have examined all questions presented in argument without finding any error in the record prejudicial to the defendant. The case has been presented with much care and ability, but we are satisfied that the conviction of the defendant should be sustained. The evidence of his guilt is ample. He was insolvent, and must have known that fact; yet he

expressly authorized his agent to receive the deposit in question. We cannot say that the punishment for which the judgment provides is excessive. What we have said disposes of all the material questions in the case, and the judgment of the district court is AFFIRMED.