L. ALMON, Appellee, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

**Railways:** LOSS OF GOODS IN TRANSIT: LIABILITY OF COMPANY. The fact that the owner of goods consigned to himself sold the same at a specified price per pound, delivered the bill of lading and directed delivery of the goods to the purchaser before their arrival, did not defeat his right of action for a portion of the goods lost in transit; as the buyer was only liable to him for the goods actually delivered.

**Same:** INSTRUCTION. A party cannot complain of an instruction more favorable to him than the evidence warrants, even if incorrect.

**New trial:** MISCONDUCT IN ARGUMENT. Where plaintiff's evidence in support of his claim against defendant railway company for goods lost in transit was of a doubtful character, resting upon his own testimony and that of a co-laborer, the statement of plaintiff's counsel in argument that he did not know why defendant's attorney should be unfair, unless because he was connected with a corporation worth millions and engaged in a lawsuit to beat a ''poor devil,'' was prejudicially erroneous.

**Railways:** LOSS OF GOODS IN TRANSIT: LIABILITY AS INSURER: INSTRUCTION. In this action for goods lost in transit, an instruction that defendant's liability as an insurer ceased when the car reached its destination and was placed upon a side track, unless the consignee gave direction to place the car at some point for unloading, and that the burden was on defendant to show that the goods were not lost before the car reached its destination, was in effect a statement that defendant was not liable as an insurer after the car reached its destination, and therefore the defendant had no ground for complaint in this respect.

**Same:** INSTRUCTIONS: PREJUDICE. Where the shipper as in this case failed to show that he gave direction to place the car on a specified track until several days after its arrival, and no negligence on the part of defendant as warehouseman was shown, and plaintiff sought recovery only on the theory that defendant was a common carrier and insurer, an instruction that defendant would be

liable for reasonable care as warehouseman, though erroneous, was not prejudicial to plaintiff, where the jury must in any event have found for the defendant under other proper instructions and the undisputed evidence.

*Appeal from Marshall District Court.*—HON. W. N. TREICHLER, Judge.

WEDNESDAY, JANUARY 14, 1914.

ACTION for damages against the defendant as a common carrier for the loss of goods delivered to the defendant for shipment and lost in transit. There was a verdict and judgment for the plaintiff, and the defendant appeals.—*Reversed and Remanded.*

*Binford & Farber,* and *James C. Davis,* and *George E. Hise,* for appellant.

*Bradford & Johnson,* for appellee.

EVANS, J.—The plaintiff is a dealer in old iron and other junk. On June 9th he delivered to the defendant company at Stanhope, Iowa, a carload of junk, being principally old iron. He claims to have included therein 2,765 pounds of rubber, being in the form of old rubber boots and shoes, and 527 pounds of copper, largely in the form of old boilers. The shipment was consigned by the plaintiff, as consignor, to himself, as consignee, from Stanhope to Marshalltown. The car was duly sealed and put en route, and it reached Marshalltown on the next day, Saturday, between 2 and 3 p. m., in good condition and with seals unbroken. It was immediately put upon the defendant's scale track and there remained until the following Wednesday morning. On Wednesday morning the plaintiff discovered the car door open. He reported the discovery to the defendant's officers and claimed that much of his rubber and copper had been stolen. The car contained

at that time 540 pounds of rubber and 80 pounds of copper. Plaintiff claims for the value of 2,225 pounds of rubber and 447 pounds of copper.

The real issue of fact in the case under the evidence was whether the car ever contained any more rubber or copper than was found therein on Wednesday morning. The plaintiff had no place of business in Marshalltown and was not known to the railroad men in charge at Marshalltown. He arrived in Marshalltown himself about Saturday noon in advance of his car and sold his arriving shipment to another junk dealer, one Friedman. Monday and Tuesday following the arrival of the car were Jewish holidays and were observed as such by the plaintiff, who was of that faith. This fact was given by him as the reason why he gave no attention to his shipment prior to Wednesday morning. One of the questions upon the record is whether the liability of the defendant, if any, was that of an insurer, as a common carrier, or that of a warehouseman only. The plaintiff charged the liability as that of an insurer and pleaded no negligence. The various errors assigned will be noted in due order.

I. The defendant contends that the plaintiff was not the real party in interest. An instruction was asked dismissing his petition on that ground. The contention is based upon the following testimony of the plaintiff: "I had sold it to Friedman on Saturday, the day I came home, as soon as I jumped off the train. . . . Immediately on my arrival in Marshalltown I jumped off the car and went over to Friedman's office and sold him the car of stuff. I don't now remember whether I delivered the bill of lading to Friedman when I sold him the car or not. I testified at the other trial that I did deliver the bill of lading to him at the time I sold him the car. It was Mr. Friedman himself that I sold the carload of junk to"— and upon the following testimony of Offman, his co-laborer: "On Saturday, the day we got back from Stanhope, I heard Mr. Almon make a sale of this rubber to Friedman for nine

1. RAILWAYS: loss of goods in transit: liability of company.

and one-half cents a pound and a sale of the copper to Fried-
man for ten cents a pound.''

The defendant's answer raised no issue as to the interest
of the plaintiff or as to a transfer thereof. The testimony
quoted was by no means conclusive that the defendant could
not be damaged by a·loss of the shipment or a part thereof.
The word ''sold'' is used with variety of meaning, especially
in common parlance. The question whether the delivery of
the bill of lading transferred the title to Friedman is ·not
controlling. If the plaintiff sold the arriving shipment to
Friedman at an agreed rate per pound, manifestly he could
collect from Friedman only for the number of pounds arriv-
ing. The shipment was consigned to himself. He could direct
delivery to Friedman and could deliver the bill of lading to
Friedman for the same purpose, but Friedman in such case
would be liable to him only for the goods thus delivered. If,
therefore, there was a loss of goods in transit, the plaintiff
could be damaged thereby.

The trial court instructed the jury that if the plaintiff
had sold his entire interest in the contents of the car to Fried-
man, and that he had no further interest therein, then he
2. SAME: instruc-  could not recover. This instruction gave to
   tion.            the defendant all that it was entitled to at
this point. Indeed, we think the evidence was not sufficient
to entitle defendant to the instruction even in this form. But
the defendant cannot complain of the error in this respect.

II. Complaint is made of misconduct on the part of the
plaintiff's counsel in the argument of the case to the jury.
In his closing argument, counsel for plaintiff used the follow-
ing language: ''I don't know of any reason
3. NEW TRIAL:    why Mr. Hise, the attorney, should be unfair
   misconduct in
   argument.     unless it is because of the fact that he is con-
nected with a corporation worth millions of dollars and en-
gaged in a lawsuit against and trying to beat a poor devil.''
This language was immediately objected to by counsel for
defendant. The court was requested to instruct or caution

the jury as to its impropriety. The trial judge, not having heard the objectionable language because of temporary absence from the room, declined to caution the jury in the respect requested except so far as the language complained of was a reflection upon defendant's counsel. We have frequently had occasion to emphasize the impropriety of such statements in argument. There was not the slightest excuse for it in the present case. It had not even the mitigation of provocation. The distinguished counsel for plaintiff was not ignorant of the severe criticism which we have heretofore applied to such conduct or of the many new trials which have been granted for such cause. The following are some of the cases: *Manufacturing Co. v. Sterrett,* 94 Iowa, 158; *Sullivan v. Railway Co.,* 119 Iowa, 464; *Welch v. Insurance Co.,* 117 Iowa, 394; *White v. Railway Co.,* 145 Iowa, 408; *Henry v. Railway Co.,* 70 Iowa, 233; *Whitsett v. Railway Co.,* 67 Iowa, 159; *Hall v. Wolff,* 61 Iowa, 559. It is urged, however, that the language used could not have been prejudicial. We have gone through the record carefully for support for this contention. If the plaintiff's case were clearly meritorious and the record otherwise free from error, there might be some room for argument along that line.

We feel compelled to say, however, that the plaintiff's case, as made upon the record, is a very doubtful one on its larger merits. The burden was on the plaintiff to show the amount of rubber and copper he had placed in the car at Stanhope. This pivotal fact rests upon the following testimony of the plaintiff:

We both did the weighing. I kept record of the weight, probably two or three days. I never looked at it again. I never kept a copy of it. We weighed the rubber on the same scales that we weighed the iron on. These were the heavy scales on the east side of the street running north and south. I drove the wagon. I didn't weigh it myself. I would sit up on the load. There was a little building or an office with a window where these scales were, and the scales were on the

inside of the room. There were two different men there did the weighing for me. I don't know their names. They didn't give me scale tickets for separate loads. They gave me the weights but not for separate loads. They were all on a piece of paper. I don't know how many loads of iron there was. We could haul about a ton or a ton and a half to the load. It would take us fifteen minutes or a half hour and sometimes more for one load. We began weighing and loading on the morning of June 8th and finished in the afternoon of June 9th, working right along at it all the time, weighing and loading into the car. Offman was helping me. We had fifteen or sixteen loads of iron, and one load of rubber; the rubber being the last load we hauled over the scales. The two men at the scales weighed the rubber as well as the iron. They didn't give me a scale ticket for the rubber. Everything was on the paper. I haven't got that paper now. I didn't make a copy of it, and don't remember what was on that paper. I have no independent recollection now as to what the total weights on that paper were. The weights of every load were put upon that paper by the two men who weighed the stuff, and it was all on one sheet. I can't remember the weight of a single load of it now or of any of it, and have no recollection as to what a single load weighed or what the total weights were. I sat on the wagon when it was being weighed by the man inside. Part of the time I jumped down to see how many hundreds I have got on. I had to jump down to see how much I had on. I couldn't see without jumping down. I don't remember exactly whether I jumped down three or four times or not. I usually sat on top of the load. . . . It is true that at the former trial of this case I testified that I could not remember and had no idea or any distinct recollection of what the weights of said scrap iron were. I further testified at that time that I was testifying from mere guesswork as to what the weights shown on said paper were.

The foregoing related to the weight of the rubber but not of the copper. As to the weighing of the copper, the plaintiff and his co-laborer, Offman, both testified that they carried it in parcels in their arms and weighed such parcels successively on certain platform scales near a grocery store

in Stanhope. At a previous trial they had testified that their copper had been weighed for them in one of the grocery stores by the person in charge. No attempt was made to explain the change in testimony at this point. The only reason apparent in the record is that the few grocers in Stanhope were present under subpœna for the defendant on the second trial. It further appeared upon the last trial that the only platform scales in the town of Stanhope were broken and incapable of use at the time in question. The evidence to this effect is undisputed and practically conclusive. As to the rubber, the evidence of disinterested witnesses who were in a position to know and who saw the quantity of plaintiff's rubber goods immediately before the shipment is very strong, if not overwhelming, that the plaintiff had not approximately such quantity of old rubber as contended for by him. The testimony of the plaintiff at the second trial differed in material respects from his testimony at the former trial. No attempt was made to explain the reason for the change. There are other circumstances also which tend to reflect upon the good faith of the plaintiff. As already stated, the car arrived on Saturday afternoon in good condition with unbroken seals. Its weight with contents was then ascertained upon the scales as 69,800 pounds. Immediately after plaintiff's discovery on Wednesday morning that the car was open, it was put upon the scales again. It then weighed 70,000 pounds. The variation of two hundred pounds is shown to be usual and ordinary in successive weighing of loaded cars and may be accounted for by weather conditions and otherwise.

This state of the evidence is not favorable to the contention that the defendant suffered no prejudice by the misconduct of counsel in argument. The language used was calculated and presumably intended to close the eyes of the jury against a dispassionate view of the evidence. We find nothing in the record to justify us in holding that it did not have that effect. On the contrary, the tendency of the record is to support the theory of prejudice.

III. Some question is raised in argument as to whether
the liability of the defendant company continued as that of
a carrier and insurer until Wednesday morning or whether

its liability should be deemed that of ware-

4. RAILWAYS: loss
of goods in
transit: liabil-
ity as insurer:
instruction.

houseman after the arrival of the car on Sat-
urday afternoon; the contention of the de-
fendant being that its liability as an insurer

ceased when the car reached Marshalltown. We think that
the question does not arise upon this record because of an
instruction actually given by the trial court. This was as
follows: "No. 7. You are further instructed that the liabil-
ity of defendant company as a carrier is an insurer of the
delivery of the copper and rubber in the car in question and
terminated when such car reached Marshalltown and was
placed on the side track in its yards where such cars are
usually placed, unless the consignee give directions to place
the same at some convenient place for unloading; and the
burden of proof is upon defendant to establish the fact that
the goods in the car in question were not lost before the car
reached Marshalltown." The effect of this instruction was to
hold that the defendant was not liable as an insurer after the
car reached Marshalltown. The defendant, therefore, got in
this instruction all that it contends for here at this point.

The foregoing instruction, however, was qualified by in-
struction No. 8, which was as follows: "No. 8. If you find
that plaintiff, as soon as the car reached Marshalltown, gave

defendant company directions to place the

5. SAME: instruc-
tions: preju-
dice.

car in question on Friedman's track, and de-
fendant failed to do so, then defendant would

still be held as a carrier and liable for the loss of the rubber
and copper, if any. But if plaintiff gave no directions upon
the receipt of the car in Marshalltown, and defendant com-
pany placed the car on the scale track awaiting directions
from the plaintiff, then defendant company's liability ceased
as a carrier, and defendant would be liable only as a ware-
houseman and only charged with reasonable care in protect-

ing the contents of the car." There was no testimony that plaintiff gave directions as soon as the car reached Marshalltown to place the car on Friedman's track. Plaintiff's testimony was that he gave such directions Monday afternoon.

There was neither allegation in the petition nor evidence in the record of any negligence on the part of the defendant as a warehouseman. In his petition the plaintiff charged the liability of the defendant only as that of a common carrier and insurer and charged no negligence as warehouseman. There was no occasion, therefore, for the statement in instruction No. 8 that the defendant would be liable for reasonable care as a warehouseman, and the instruction was technically erroneous in this respect. Nevertheless, if the jury had followed instructions 6 and 7, under the undisputed evidence, they must have found for the defendant.

These instructions, as given, were the law of the case whether abstractly right or wrong. For the reasons indicated, a new trial must be awarded. The judgment below is accordingly reversed, and the case remanded.—*Reversed* and *Remanded.*

LADD, C. J., and WEAVER and PRESTON, JJ., concurring.