STATE OF IOWA, Appellee, v. ROBERT LEE SCOTT, Appellant.

CRIMINAL LAW: Argument and Conduct of Counsel—Inferring Irrelevant Inflammatory Facts. A public prosecutor is guilty of reversible error when, in a cause depending on one all-important and debatable question, he persistently, under cover of cross-examination of the accused, or in argument to the jury, injects into a record and before the jury a series of *inferred* facts which are wholly foreign to any legitimate issue in the case, and which manifestly were intended to prejudice and did prejudice the jury against the accused.

So held where, in a homicide case, the *inferred* facts were that defendant was named after a rebel general, was part Indian, was quarrelsome, and could not prove otherwise, had told about killing people, had lain in wait with murderous intent, had pointed revolvers at people, had cursed women, had corrupted witnesses, and had fraudulently disposed of his property.

*Appeal from Jefferson District Court.*—C. W. VERMILION,
Judge.

NOVEMBER 14, 1922.

UPON an indictment for murder, the defendant was con-
victed of manslaughter, for the killing of one Harry Skinner.
From the judgment of conviction he has appealed.—*Reversed.*

*Work, Lewis & Work* and *Starr & Jordan,* for appellant.

*Ben J. Gibson,* Attorney General, *John Fletcher,* Assistant
Attorney General, *R. H. Munro,* County Attorney, and *Joe R.
Jaques,* for appellee.

EVANS, J.—I. The deceased, Harry Skinner, was killed
on the evening of December 9, 1920, as the result of an alter-
cation between him and the defendant, in the defendant's store
at Linby, Jefferson County. Skinner died as the result of a
wound inflicted upon him by the single thrust of a cheese knife,
in the hands of the defendant. Before inflicting the wound, the
defendant had been twice shot by Skinner: one bullet entering
his left arm, and the other entering his body at a point one
inch below the left nipple. The deflection of the bullet by the
striking of a rib prevented it from entering the heart cavity.
Skinner was a man 31 years of age, 5 feet 11 inches tall, and
weighing 175 pounds. The defendant was shorter in stature
and lighter in weight, and was 57 years of age. A few months
before, he had submitted to a surgical operation for the removal
of one eye. This had caused him considerable disability for
many weeks. He also suffered from heart trouble in some de-
gree. The evidence is quite undisputed that Skinner "carried
a gun" ostentatiously, and was a quarrelsome bully. Never-
theless, he and Scott had been personally acquainted for many
years, and had at all times maintained friendly relations, up
to the moment of the altercation. Skinner owed Scott a small
account. He had received a request for payment. Responding
thereto, he came to the defendant's place of business, which
was a store and post office. He claimed a discrepancy of a few
cents in the statement of the account, which the defendant pur-

ported to explain. Skinner said: "You are a God damn liar." Hereupon, the defendant ordered him out of the store. At that time, the store counter separated the parties. The defendant reinforced his order by going around the end of the counter and approaching Skinner. Skinner responded with his "gun," and discharged two bullets into the person of the defendant. The grapple of the parties followed. The defendant claims that that was the only method open to him, to protect himself against further discharge of the revolver. This weapon was a 32-caliber magazine automatic revolver. After two shots were fired, it "jammed," and failed to discharge the third cartridge. This rendered it useless, for the time being. This fact, however, was not known to the defendant. He believed that he had received three bullets in his person, and claims that he was fighting for his life. That the defendant grappled with Skinner at the time of the shooting, is undisputed. The entrance to the defendant's store was at its south end. The building stood north and south. The store room contained counters, one on the east side and one on the west. Between the counters was a space of 8 feet, extending the length of the store. When the altercation began, the defendant was behind the east counter, at a distance about midway between the two ends. To come from behind the counter, he passed through an opening therein, which opening was a few feet north from where he at first stood. He then faced south toward Skinner. In their grappling, the combatants moved southerly in the direction of the entrance or exit, and were within 10 or 12 feet thereof. They were at this point when the revolver became useless. After the defendant was shot, the grapple continued. The defendant claims that Skinner held him by the throat. From that time, they moved northerly in the struggle, for a distance of about 30 feet. At this point, they were in close proximity to the cheese case and the cheese knife. This was the knife with which the fatal thrust was made. It is the claim for the State that the defendant had possessed himself of this knife at the time of his first advancing upon Skinner; whereas the defendant claims that he did not have the knife in his hand until he came to its proximity in the struggle. The outer wound upon Skinner's body was a cut 2 inches in length. The knife was buried therein to the hilt. The blade was

about 11 inches in length. At a point in near proximity to the cheese case, and after the infliction of the wound, the combatants both fell to the floor, exhausted. A doctor was called by a bystander. Thirty feet farther south upon the floor was Skinner's revolver. Its condition indicated that a third shot had been attempted, and that it was prevented by the jamming of the cartridge. Skinner died within 15 minutes. The beginning of the altercation was witnessed by 5 bystanders. Several of these, and perhaps all of them, ran away, for their own protection, when the shooting began. All of these were witnesses for the State. The evidence is not greatly in dispute, except as to one very important fact. It was incumbent upon the State to prove that the defendant was not acting in lawful self-defense. The theory of the State is that the defendant armed himself with the knife when he made his first advance upon Skinner. There is no direct evidence in support of this particular claim. The defendant, as a witness, denied it, and testified that he first obtained the knife from the east counter, north of the opening, when the combatants, in their struggle, came to that point. At the time of defendant's first advance, three of the State's witnesses sat upon the west counter, just opposite the opening of the east counter through which the defendant came. Two others of the State's witnesses were near by. None of them saw any weapon in the defendant's hand at that time. Some of them testified that they saw him reach for something at the base of the shelving. These witnesses were on the right-hand side of Scott, as he passed down toward Skinner, and were within 3 or 4 feet of him. The question of fact here presented was the turning point in the case, so far as the jury issue was concerned. The trial court instructed the jury that the defendant had a right to order Skinner out of his store, and had a right to use such force as was reasonably necessary to put him out, if he otherwise refused. This was correct. It was incumbent upon the State, therefore, to show something more than that the defendant approached Skinner unarmed, while he ordered him out of the store. Such an approach did not justify the use of firearms by Skinner. Nor did it deprive the defendant of the right thereafter to make lawful self-defense against the use of firearms by Skinner. Skinner was near the exit. There was no obstruction

between him and it. The witnesses for the State testified that the shooting occurred when the defendant was a few feet distant from Skinner. The actual grapple of the parties occurred afterward. The defendant testified that he grappled Skinner to prevent further shooting. If it be true, therefore, that the defendant approached Skinner unarmed, his right to defend himself against an attempted shooting was undoubted, and he had a right to resort to extreme measures to that end. In order for the jury to find that defendant was not acting in lawful self-defense, it must have found that the defendant had armed himself with the knife in his first approach upon Skinner. This conclusion on the part of the jury must have been drawn from the circumstances disclosed in the evidence. No witness testified to the fact directly. On this question of the possession of the knife, and when the defendant obtained it, whether it can be said, upon this record, that the circumstances are less consistent with the testimony of the defendant than with the theory and claim of the State, is, to our minds, a very close question.

II. We have given the foregoing outline of the evidence, as a basis for the consideration of particular errors assigned by appellant. These alleged errors go to the proposition that, by reason of certain incidents which occurred in the cross-examination of the defendant, and in the argument of counsel for the State to the jury, he was clearly prejudiced, and thereby failed to obtain a fair trial, within the meaning of the law. The defendant was a witness in his own behalf, and testified to the circumstances of the homicide. He also testified to the fact that he was born in Jefferson County, and had lived there all his life, except for seven years when he lived in the state of Arkansas. He had been postmaster of his town for five years, and was the proprietor of the store in which the tragic event occurred. He also testified to his acquaintance of several years with the deceased, and of his knowledge of him as a quarrelsome fighter. Complaints are directed to certain features of his cross-examination. Some of these are not tenable; some of them are. His cross-examination opened as follows:

"Q. Now it is a matter of family history that you were named after the confederate general Robert Lee, in 1864? (Objected to as immaterial and prejudicial. Sustained.) Q. Now

is it or is it not a fact that there is Indian blood in your veins,—
is that a matter of family history? A. It is not. (Objected
to as not proper examination.) Q. * * * When was it that he
told you that he had killed a man or shot a man in Missouri?
Was that when you first got acquainted with him? A. No, sir.
Q. And you were telling him at the same time about killing a
man in Arkansas, were you not? A. I did not. Q. You didn't
tell him that? A. I did not. * * * Q. Some years ago, you
laid in wait under some evergreens one time, for the express
purpose of killing Lafe Dudgeon? A. I never did. * * * (That
is objected to for the same reason set forth before.) Q. And
did you lay in wait for him one night? A. Never. Q. You
have pointed the revolver at other persons in your store besides
the persons I have mentioned, have you not? A. I never did.
* * * Q. When Barngrover's mother was in there to get the
mail, you cursed her, didn't you? A. I never did.''

Appropriate objections were made to the foregoing, some
of which were sustained and some overruled. The foregoing
questions were not predicated upon anything in the defendant's
examination in chief; nor was there any basis therefor in the
State's evidence in chief or in rebuttal. No other inference is
permissible than that they were intended to create in the minds
of the jury an impression that the alleged facts inquired about
existed.

These lines of inference were followed up with undue dili-
gence in the arguments for the State to the jury. Counsel for
the State said:

''Scott says his father settled in that community in 1843.
I don't remember that far back. I do know that, in 1864, that
being the year Scott says he was born, that from this county,
my father and his two brothers had enlisted in the Union army,
to suppress the great rebellion against our nation. I do know
that the great general leading that rebellion was Robert E. Lee,
and that in 1864, in the midst of that great war, this Robert
Lee Scott was born, out here in Iowa.''

The defendant did not put his character in issue. No char-
acter witnesses were offered by either side. In argument to the
jury, the attorney for the State said:

''Now the law permits this man to prove his good character

and his good reputation.  He could have brought six witnesses here from his neighborhood and the vicinity in which he lives, to prove that he was a peaceful, law-abiding citizen.  He didn't see fit to do it.  Now, gentlemen, do you think that, if he could have proven by six witnesses, or any witnesses, from the vicinity of Linby or Farson, that he was a peaceful, peace-loving, unquarrelsome man, that he wouldn't have done it?  Now, unfortunately, the State couldn't go into that question unless he did.  The law raises a presumption that a man has got a good reputation, and unless he seeks by some evidence to support or prove his good reputation, the State can't attack it.  Naturally, we were barred from that.  Had he seen fit to undertake to prove that he had a good reputation for peacefulness, that he was not quarrelsome, that he didn't have a vicious disposition, then we could have introduced evidence to the contrary.  He knew all these things.  He was well advised, and he didn't see fit to introduce any such testimony. * * * Harry Skinner knows the quarrelsome, vicious disposition of Lee Scott.  Harry Skinner knows that you can't find a man in Jefferson County who will come into court and swear that Lee Scott was of a peaceable nature.''

Also the following:

''I don't believe, gentlemen, that, when Mr. Scott deeded every dollar's worth of property he had under the sun to his wife on the 16th day of December, that he didn't have a conscious knowledge that he had not only violated the state laws, but had damaged the widow and the children of this man, Skinner.''

The following also:

''But now, mind you, Harry Skinner hadn't a bit of reputation left, after that meeting in Starr & Jordan's office last Friday,—not in the minds of any one of these witnesses; not in the mind of Doc Henry; not in the mind of Doc Wiley; not in the mind of Fray, Bender, Joe Slater, Gus Fray, and Effie Fray,—every one of whom went up there and attended that convention; every one of whom got up and said their little speech in the presence of each other, so that they all would know what the others were going to testify to.  I can appreciate, gentlemen, how it may be convenient—it may be necessary—for counsel to know something about what the witnesses are going

to testify, before he puts them on the stand; but it isn't necessary to take those witnesses up and put them all together and rehearse all together, and thereby violate that very . rule that this court put on the witnesses when this trial commenced: that they should remain out of the court room, and not hear what the others said, and give their testimony unbiased and fair.  I say, right in the teeth of that very instruction, they were marched into the counsels' office, and they went over and rehearsed their entire stories."

The remarks of counsel which are quoted in the foregoing were all gratuitous, and not based upon the evidence.  The impropriety of them and each of them is readily apparent, and we see no occasion to discuss them in that regard.  What amounts to prejudicial misconduct is not easily defined, with any particularity.  Perfect procedure or perfect argument is a practical impossibility.  In the consideration of such a question, we will look into the whole record, in order to determine whether unwarranted conduct was probably prejudicial.  If a case were close and doubtful in a material respect, and if the unwarranted conduct is calculated to obscure the point and to deflect the minds of the jury away from it, rather than to invite candid consideration of it, we must, of course, find prejudice more readily than otherwise.  We see no way to lay down a hard and fast rule, to determine when misconduct in argument or when examination of witnesses is prejudicial.  Upon a consideration of this record as a whole, we are united in the view that it was prejudicial, in that it did prevent the defendant from having a fair trial.  Sinister references, either by cross-examination or by argument, to a supposed event, in a remote time and place, leave the defendant quite defenseless, even if evidence were readily available, in addition to his own, to disprove them.  The court, in the interest of orderly trial, could not and should not permit such a chase to be taken up.  The matters which we have above quoted were all calculated to inflame passion and prejudice against the defendant, quite independently of the proven facts of the case.  There could have been no other motive for resort to them.

We reach the conclusion that defendant's motion for a new

trial should have been sustained on this ground. The judgment is, accordingly, reversed.—*Reversed.*

STEVENS, C. J., ARTHUR and FAVILLE, JJ., concur.