STATE OF IOWA, Appellee, v. ARCHIE BURRIS, Appellant.

**HOMICIDE: Murder in First Degree—Essential Element.** A specific
1  intent to kill is an essential element of murder in the first degree, but not of murder in the second degree.

**HOMICIDE: Murder—"Malice" Defined.** Malice means that condition
2  of the mind which prompts one to do a wrongful act intentionally and without legal justification or excuse. It does not mean mere spite, hatred, or ill will, but does signify that state of disposition which shows a mind regardless of human life.

**HOMICIDE: Malice—Presumption from Use of Deadly Weapon.**
3  Malice may be presumed from the intentional use of a deadly weapon in a deadly and dangerous manner.

**INDICTMENT AND INFORMATION: Failure to Return Grand Jury**
4  **Exhibits—Effect.** Relevant exhibits are admissible on the trial of an indictment *even though they were before the grand jury and were not attached to the indictment, nor in any manner returned therewith, nor filed with the clerk.* But the accused should be, in some proper manner, apprised of and given ample opportunity to inspect such exhibits.

**CRIMINAL LAW: Trial—Order of Receiving Testimony—Rebuttal as**
5  **Repetition of Testimony Already Given.** Rebuttal testimony is not necessarily inadmissible because, to some extent, it is a *repetition* of the testimony of the witness given in proof of the main case.

**CRIMINAL LAW: Instructions—Absence of Evidence in re Reasonable**
6  **Doubt.** It is error (though not necessarily reversible error) for the court to base a reasonable doubt on the facts and circumstances which are shown *in the evidence,* without proper reference to the effect of the *absence* of evidence.

**CRIMINAL LAW: Conduct of Trial—Undue Cross-Examination of**
7  **Accused.** Cross-examination of an accused reviewed, and held not of such prejudicial character as to have affected the rights of the accused.

FAVILLE, J., dissents.

CRIMINAL LAW:   Reception of Evidence—Incidentally Received Testimony as Constituting Error.   Reversible error is not made to appear from the fact that the State, in proving the purchase of a revolver by the accused (a colored man on trial for murder), *incidentally* brought out evidence tending to show that a white woman rendered the accused assistance in the said purchase, and that undue familiarity existed between said white woman and the accused.

FAVILLE, J., dissents, both on principle and to the finding that the testimony was received ''incidentally.''

CRIMINAL LAW:   New Trial—Inflammatory Argument.   Argument in the trial of a colored man for murder reviewed, and held not inflammatory and not prejudicial to such extent as to demand a reversal on a second appeal, in the face of practically conclusive evidence of guilt.

FAVILLE, J., dissents.

CRIMINAL LAW:   New Trial—Argument—Presumption of Legitimacy.   The presumption may well be indulged that a closing argument on behalf of the State was a legitimate reply to the argument of counsel for the accused, (1) when there is no denial that it was in reply to what defendant's counsel had said; (2) when much of the argument shows affirmatively that it was such reply; (3) when the argument on behalf of the accused is not before the court; (4) when the guilt of the accused is manifest; (5) when the trial court, with first-hand knowledge of the conditions, has overruled the motion for a new trial.

FAVILLE, J., dissents.

*Appeal from Wapello District Court.*—F. M. HUNTER, Judge.

APRIL 4, 1924.

REHEARING DENIED DECEMBER 11, 1924.

THE defendant was indicted for murder in the first degree, and upon trial was convicted and sentenced to be hanged. He prosecutes this appeal.—*Affirmed.*

*Daniel F. Steck,* for appellant.

*Ben J. Gibson,* Attorney-general, *John Fletcher,* Assistant Attorney-general, *N. W. Roberts,* and *L. L. Duke,* for appellee.

PRESTON, J.—This is the second appeal of this case. The opinion upon the first appeal is reported in 194 Iowa 628. The material facts of the case are set out in the former opinion, and there was but little variation in the evidence upon the second trial. It is not necessary that we repeat the facts in this opinion.

1. The court instructed the jury as follows:

"The distinguished features between murder in the first degree and murder in the second degree are that, in the former, or murder in the first degree, there must be, in addition to the element of malice aforethought, a specific intent to kill; and the assault and killing must be willful, deliberate, and premeditated; while in the latter (or murder in the second degree), it is sufficient if the assault and killing was unlawful and felonious and with malice aforethought."

*1. HOMICIDE: murder in first degree: essential element.*

It is contended by appellant that the court erred in instructing the jury that a specific intent to kill was essential to establish murder in the first degree, but, in effect, that it was not a necessary element of murder in the second degree. As early as *State v. Decklotts*, 19 Iowa 447, we said:

"A specific intention to kill, to take life, is not essential, at common law, to constitute murder; nor is it essential, under our statute, to constitute murder in the second degree, although it is essential to constitute murder in the first degree."

This declaration has been adhered to in repeated decisions of this court. *State v. Gillick*, 7 Iowa 287, 312; *State v. Morphy*, 33 Iowa 270; *State v. Mewherter*, 46 Iowa 88, 102; *State v. Keasling*, 74 Iowa 528; *State v. Seery*, 129 Iowa 259; *State v. Baldes*, 133 Iowa 158; *State v. Quan Sue*, 191 Iowa 144, 153. There was no error at this point.

2. In Instruction No. 12, the court said:

"Malice, as used in the indictment and these instructions, means that condition of the mind which prompts one to do a wrongful act intentionally, without legal justification or excuse. It does not mean mere spite, hatred, or ill will, but does signify that state of disposition which shows a heart regardless of human life. This character of malice may be presumed from the intentional use

*2. HOMICIDE: murder: "malice" defined.*

of a deadly weapon in a manner likely to inflict great bodily' injury or death.''

Appellant challenges the first of the quoted sentences.. .The objection is not well taken. The definition given by the court is identical in language with an oft repeated definition of malice in cases of homicide which has stood the test of time and repeated attacks. The definition evidently originated in *Bromage v. Prosser*, 107 Eng. Reprint 1051, decided in 1825. It has been repeated in a very large number of cases that have met with the approval of the English and American courts of last resort. See 5 Words & Phrases 4298, 4300, 4301; 29 Corpus Juris 1084, 1085, and many cases cited. We have held that it is not erroneous. *State v. Decklotts*, 19 Iowa 447; *State v. Klute*, 160 Iowa 170.

The last sentence of the instruction is likewise criticized. It is the uniform and general holding, in cases of homicide, that malice may be presumed from the intentional use of a deadly weapon in a deadly and dangerous manner. *State v. Zeibart*, 40 Iowa 169; *State v. Townsend*, 66 Iowa 741; *State v. Hockett*, 70 Iowa 442; *State v. Hayden*, 131 Iowa 1; *State v. Brown*, 152 Iowa 427; *State v. Teale*, 154 Iowa 677. In a separate instruction, the court defined accidental shooting, and told the jury that, if the defendant shot the decedent negligently and recklessly, the crime would be manslaughter, and not murder, and that, if he exercised due care, and the killing was accidental, then he should be acquitted. We fail to find error here.

3. Homicide: malice: presumption from use of deadly weapon.

3. It appears from the evidence that, on December 18, 1921, the appellant had signed a written confession, which is referred to in the evidence as Exhibit L. This written instrument was before the grand jury which returned the indictment in the case, but the same was not returned with the indictment and filed with the office of the clerk of the court and attached to the indictment. It was offered in evidence by the State, and appellant's objections thereto were overruled. Section 5258 of the Code provides as follows:

4. Indictment and information: failure to return grand jury exhibits: effect.

''When an indictment is found, all minutes and exhibits

'relating thereto shall be returned therewith and filed by the clerk of the court, and attached to the indictment.''

Prior to the enactment of this section of the statute, we held that exhibits that were before the grand jury and were not noted upon the minutes of the evidence were admissible in evidence, and that it was not necessary to set out such exhibits or note them in the minutes of the evidence. *State v. Mullenhoff*, 74 Iowa 271; *State v. Hurd*, 101 Iowa 391; *State v. Boomer*, 103 Iowa 106. In *State v. Mulhern*, 130 Iowa 46, we held that, under Section 5276 of the Code, it was not necessary to return exhibits used before the grand jury, with the indictment. In *State v. O'Malley*, 132 Iowa 696, the question arose on a motion to set aside the indictment for the reason that certain exhibits which were before the grand jury were not returned with the indictment and filed with the clerk of the court. We referred to *State v. Mullenhoff*, supra, and *State v. Boomer*, supra, and said:

''The requirement that all exhibits be returned with the indictment and filed by the clerk was manifestly intended to cure the defect in the statute theretofore existing, and to meet the decision in the *Mullenhoff* case.''

We held, however, in said case, that the failure to so return the exhibits was not a ground for motion to set aside the indictment. In *State v. Ottley*, 147 Iowa 329, the question came before us where, on motion to set aside the indictment, it was contended that an exhibit used before the grand jury was not filed with the clerk. We held that such failure to file was not a ground for setting aside the indictment, and said, by way of dictum:

''Nor would such failure render the note inadmissible in evidence.''

In *State v. Howard*, 191 Iowa 728, it appeared that a pistol used as an exhibit before the grand jury was offered in evidence, and the objection was made that it was not properly identified and filed in the office of the clerk with the minutes of testimony, as required by Section 5258, Code Supplement, 1913. The objection was overruled, and error predicated thereon. We said:

''The statute requiring exhibits used by the grand jury

during its investigation to be filed in the office of the clerk with the minutes of the testimony is directory only."

We cited, in support of this statement, *State v. Mulhern,* supra, *State v. O'Malley,* supra, *State v. Ottley,* supra, and said:

"The failure to file the same in the clerk's office did not render them inadmissible" (citing *State v. Mullenhoff,* supra, *State v. Boomer,* supra, *State v. Ottley,* supra).

Appellant concedes that *State v. Howard,* supra, is apparently directly contrary to his contention in this case, and he argues that the same is erroneous, and should be overruled. Conceding that by its language Section 5258 provides that all minutes and exhibits relating to the indictment "shall be returned therewith and filed by the clerk of the court," and attached to the indictment, the question arises as to what is to be the result if this provision of the statute is not complied with. Code Section 5276 provides that the names of witnesses examined before the grand jury must be indorsed thereon, and that the indictment "must be, with the minutes of the evidence of such witnesses, presented to the court by the foreman in the presence of the grand jury, and all of the same marked filed by the clerk." It is to be noticed that, in Section 5276, no reference is made to requiring the exhibits to be presented to the court by the foreman of the grand jury, or to be filed. Turning to Code Section 5319, we find that a motion to set aside an indictment can be made upon various grounds, among which are:

"2. When the names of all witnesses examined before the grand jury are not indorsed thereon; when the minutes of the evidence of the witnesses examined before the grand jury are not returned therewith;"

We have held that, under this statute, where the names of the witnesses who were examined before the grand jury were not indorsed thereon, while a motion to set aside the indictment because thereof would lie, under Section 5319, the failure to so indorse the names of the witnesses was not a ground for excluding the testimony upon the trial of the case. *State v. Flynn,* 42 Iowa 164; *State v. Fowler,* 52 Iowa 103; *State v. Story,* 76 Iowa 262; *State v. Craig,* 78 Iowa 637; *State v. Beal,* 94 Iowa 39. These decisions were prior to the adoption of the Code of 1897,

but were under the Code of 1873, Section 4337, which, in this particular respect, is to the same effect as the Code of 1897. Likewise, the failure to return the minutes of the evidence of witnesses before the grand jury is made by said statute a ground for motion to set aside the indictment. The failure to return and file the exhibits is not, however, made a ground for motion to set aside the indictment. The legislature has made no provision regarding the result that shall follow from a failure to return and file the exhibits. The statute does not make such failure a ground for setting aside the indictment, nor does it provide that exhibits not so returned and filed are not admissible in evidence. We are constrained to adhere to our pronouncement in the *Howard* case, that the statute regarding the return and filing of exhibits is directory, and not mandatory. We are not to be understood as holding that the State may arbitrarily withhold exhibits produced before the grand jury, and then, without warning, or right of inspection on the part of the defendant, introduce them unexpectedly upon the trial of the cause. The State should fairly disclose its intentions in such a matter, and if any exhibit offered before the grand jury is not returned and filed with the clerk, it should be referred to, by description or otherwise, in the minutes of the grand jury, so that the defendant may be advised of its character; and at all times the trial court has the power, and should exercise the same, to require the State, upon application by the defendant, to permit an inspection, under proper conditions, of any and all exhibits which are used before the grand jury and which are intended to be offered in evidence upon the trial of the case. A defendant's rights can and should be fully guarded in this manner. The court did not err in overruling appellant's objections to the admissibility of the exhibit in evidence upon the ground that it had not been returned with the indictment and filed with the clerk.

4. Complaint is made by the appellant that the State was permitted to offer, in rebuttal, testimony of the witnesses who had testified to the same subject-matter as a part of the State's

main case. The general order of procedure in the trial of cases is provided in Code Sections 3700, 5371, and 5372; but the matter rests very largely in the discretion of the trial court. We have examined the record, and fail to find that the court abused its discretion in the matter of the admission of this testimony in rebuttal. It was proper rebuttal testimony, even though it was likewise, to some extent, a reiteration of testimony given by the same witnesses on the main case. There was no error here.

5. Complaint is made of the court's instruction on reasonable doubt. The instruction is subject to the same criticism urged against a similar instruction in *State v. Smith*, 192 Iowa 218; *State v. Ritchie*, 196 Iowa 352; *State v. Smith*, 194 Iowa 639; *State v. Tonn*, 195 Iowa 94. We have refused to reverse because of the giving of this instruction, but said that it should not be given. It is not an "approved" instruction. We may be pardoned the observation that the bench and bar can materially help in clarifying the law by avoiding the use of instructions which, while not constituting reversible error, are still faulty, inapt, and undesirable. It has become an unfortunate practice to seize upon some challenged instruction that an appellate court has tolerated as not being erroneous enough to require a reversal, and present the same as being an "approved instruction." Their repeated use serves only to perpetuate in the law that which is faulty and deficient. Inaccuracy should not thus be preserved.

6. Misconduct is urged upon the part of counsel for the State in the cross-examination of the appellant, who was a witness in his own behalf. On cross-examination, appellant testified that he took Charley Dutton's wife to and from the hotel, and that she was sometimes called Dora McGee, and sometimes Mrs. Dutton, and that he did not know which was her proper name. He was asked if he knew that she was married to Charley Dutton, and objection thereto was sustained. He was also asked if he knew she was a white woman, to which question

5. CRIMINAL LAW: trial: order of receiving testimony: rebuttal as repetition of testimony already given.

6. CRIMINAL LAW: instructions: absence of evidence *in re* reasonable doubt.

7. CRIMINAL LAW: conduct of trial: undue cross-examination of accused.

objection was sustained. He was asked if he got the gun of Sol Meyers, and answered, "Yes." He was then asked, "And this woman stood good for it?" to which objection was sustained. Thereupon, counsel for appellant stated:

"I wish the court would caution counsel that it is improper cross-examination, and that he should refrain from it."

No ruling was had. Thereupon, the following took place:

"Q. And yet you and Charley Dutton were on intimate enough terms that you brought this woman, whom you said was called Mrs. Dutton sometimes, and Dora McGee sometimes, back and forth to see Charley Dutton when he was in jail? (Objected to as argumentative, and not proper cross-examination. The Court: Objection overruled. Exception.) Q. Isn't that true? A. Yes, sir. Q. And you were on good enough terms with the woman that you say was Dutton's wife, that she stood responsible for you when you bought this 45-caliber automatic revolver? (Objected to as improper cross-examination. Objection sustained.) "

We hold that the alleged misconduct of the prosecutor in this regard was not of such prejudicial character as to have affected the rights of the appellant or to have influenced the jury in its verdict. This matter will be referred to again, later in the opinion.

7. One Meyers was a witness in behalf of the State, and testified that he sold the appellant the revolver with which the shooting was done. He also testified that, at the time of the sale

8. CRIMINAL LAW: reception of evidence: incidentally received testimony as constituting error.

of the revolver to appellant, a paper was given him, guaranteeing the money in payment of the revolver. The paper was identified as Exhibit B. The witness was then asked who signed the paper, and, over proper objections, was permitted to answer that it was signed by one Dora McGee, and, over objection, was permitted to further testify that Dora McGee and the appellant came to the store together, and that the gun was turned over to Dora McGee in the presence of the appellant, and that they left the room together. The appellant's objection to the introduction in evidence of Exhibit B was sustained. The appellant's counsel, in open court, stated that he made no objection to the offer

of the gun, and admitted of record that "it is the gun he had," and that he got the gun from the witness Meyers. The appellant then moved to strike out as immaterial all reference to the surety who was with the appellant at the time the gun was purchased, which objection was overruled.

In argument to the jury, the special prosecutor for the State said:

"The evidence shows this: That he went down to the pawn-shop in order that he might buy an automatic revolver; that he selected a revolver there, and he even went so far that he went up and got Dora McGee, who lived up over the pawnshop, or somewhere in that vicinity, and got her to stand responsible, or to stand as surety for that revolver. * * * for some unaccountable reason he wants a gun so badly for some purpose, and to the extent that he goes up and gets Dora McGee to come down to that pawnshop and stand responsible for the payment of the gun. * * * I believe that, back there three days before this crime was committed, that he was premeditating on something of this kind; else why should he have been so anxious to have an automatic revolver that he went and got Dora McGee to come down there and stand surety for the buying of that gun? * * * and this fellow was hauling Dora McGee back and forth, to the jail and home again."

No objections were interposed by the appellant's counsel to this line of argument. The only material question in regard to the matter was the fact of the purchase of the gun and the time of the purchase. The testimony elicited with regard to the fact that a woman was present at the time, and became surety for the appellant for the payment of the gun, was not significant; but the evidence as to the purchase of the gun was proper, as tending to show preparation by defendant. We cannot reverse a case of this character merely because, during a long trial, im-material testimony of this kind is incidentally received in evidence. Its admission in evidence did not constitute such error as to require a reversal of the case.

The closing argument to the jury of counsel for the State is complained of. It is set out at length,—that is, so much as purports to have been taken by the reporter. From the abstract,

9. CRIMINAL LAW: new trial: inflammatory argument. it was not all so taken. It is stated in argument by counsel for the State that the closing argument was not properly preserved, and is not a part of the record, and that it can only be preserved by bill of exceptions; and so on. But the abstract sets out so much of the argument as is claimed to have been taken by the reporter. The State has not filed an additional abstract in denial of the recitals in the abstract. The argument for defendant was not preserved, and there is no showing as to what counsel for defendant said,

10. CRIMINAL LAW: new trial: argument: presumption of legitimacy. except that, in the closing argument itself, much of it purports to be in answer to statements made by defending counsel. There is no denial by counsel for defendant that such is the fact. There may be a word or sentence in the closing argument which we would not approve. It is inconceivable that a jury determining a question of life and death would disregard all the testimony, their oaths and consciences, and decide a case of such importance on a chance word or sentence made in the heat of argument, or that they would be influenced thereby.

Some isolated sentences are selected without any reference to the connection in which they were made, and are complained of as reversible error. After reading and rereading all the argument that was preserved, we are satisfied that, taken as a whole, it is not inflammatory, and is not prejudicial; and especially is this true when we have no means of knowing what argument was advanced on behalf of the defendant. In passing, it may not be out of place to say that the evidence shows that the defendant's wife and three small children, aged from about eighteen months to seven or eight years, were present in the court room. The children were not witnesses.

The closing argument for the State shows on its face that, in the attempt to sustain the witnesses for the State, reference is made to the fact that counsel for defendant claimed that they did not tell the truth, when under oath. We are not criticizing counsel for the defendant in the instant case. The courts can readily understand that counsel do sometimes, in their zeal and in the heat of argument, overstep, to some extent, proper bounds. A prosecutor thoroughly convinced of the guilt of a defendant

may realize that, from the ingenuity of his opponent, and because of arguments outside the record, or because of sympathy, counsel for defendant is running away with the case, and that there is likely to be an acquittal.

We realize the difficulty of a trial court in attempting to control arguments to juries. It is usual, and proper enough, that the arguments should take a wide range, by way of illustration, and so on. Quoting from an opinion by the late Mr. Justice Weaver:

"True, it [the alleged misconduct] did not tend to establish guilt, but we do not understand counsel to have been claiming any such effect for it. * * * The comments thereon may or may not have been logical and just, but that is something that the court cannot assume to control. Within reasonable limits, the language of counsel in argument is privileged, and he is permitted to express his own ideas in his own way, so long as they may fairly be considered relevant to the case which has been made. No lawyer has the right to misrepresent or misstate the testimony. On the other hand, he is not required to forego all the embellishments of oratory, or to leave uncultivated the fertile field of fancy. It is his time-honored privilege to—

'Drown the stage in tears,
Make mad the guilty and appal the free,
Confound the ignorant, and amaze, indeed,
The very faculties of eyes and ears.'

"Stored away in the property room of the profession are moving pictures in infinite variety, from which every lawyer is expected to freely draw on all proper occasions. They give zest and point to the declamation, relieve the tediousness of the juror's duties, and please the audience, but are not often effective in securing unjust verdicts. The sorrowing, 'gray-haired parents,' upon the one hand, and the broken-hearted 'victim of man's duplicity,' upon the other, have adorned the climax and peroration of legal oratory from a time 'whence the memory of man runneth not to the contrary;' and for us at this late day to brand their use as misconduct would expose us to just censure for interference with ancient landmarks." *State v. Burns,* 119 Iowa 663, 671.

We have sometimes referred to the fact that, in many instances, the effort on behalf of defendant is to secure an acquittal, whether or no, because, in that case, the State is not entitled to a new trial. *State v. McClure,* 159 Iowa 351, 354; *State v. Hickman,* 195 Iowa 765; *State v. Browman,* 191 Iowa 608. See, also, *State v. Cleaver,* 196 Iowa 1278.

It is conceded that a defendant is entitled to a fair trial, and we would accord to every defendant such a trial. The State is also entitled to a chance. The same rules as to argument should apply to both. Under the circumstances, we feel justified in referring at some length to the matters contained in the closing argument. Before quoting therefrom and setting out many instances wherein the argument purports to have been in answer to argument for the defendant, we shall refer to two or three statements in a somewhat general way, and show the connection, without too much detail.

Before doing so, it may be well, at this point, to state that defendant made and signed a written confession before four witnesses, in which he said:

"I went to the Jessie Allen home, where I met my wife, and also the girl with whom I have been intimate, Hattie Renfrew. After talking for about fifteen minutes, my wife told me she was through with me, and Hattie told me she was through with me forever. I then pulled my gun, which I had taken in the house from the car, and shot Hattie Renfrew. I saw her fall. I then stepped to the door, and shot my wife. I shot several shots, but did not know how many took effect. I confess to it all, and *will plead guilty* to the court."

No claim in it that the killing was accidental. Was the argument of the prosecutor unwarranted, when he said that, in his opinion, the defendant should have pleaded guilty?

Referring now to the closing argument, counsel for the State refers to the War of the Rebellion, the number of men engaged and killed, Lincoln's Gettysburg Address, the number of men killed in different battles, and so on; that the war was in order that slavery should be put down, and that the colored people might have equal protection of the laws; that it was up to the jury to uphold the standard of the colored race. Some of

this last appears to have been in response to argument for defendant. We have no doubt that his counsel made the most of the fact that he was a colored man, and that he and his race had been at a disadvantage in the past. This would naturally be the argument. The evidence shows that defendant had been well educated; had attended school, college, and so on. The State suggested that defendant was ungrateful for what had been done for him. Reference is also made to the punishment which should be inflicted, and that, in the opinion of the speaker, defendant should have entered a plea of guilty. No objection appears to have been made to many of the matters referred to by counsel for the State. At the end of the quoted part of the argument, it appears that counsel for appellant objected to the reference to what punishment should be inflicted, as not applicable to the case, and to the reference to defendant's having taken a trial, as he was entitled to do. Much is made in argument here of the reference to a rattlesnake. The mere mention of the word is not all there is to it. Some of the circumstances in connection with this statement should be referred to. Evidence in the record shows substantially this: That defendant and deceased had been guilty of adultery; that she and defendant's wife were through with him; that because of this he was sore, and went to the place where the two women were, armed with a very large revolver,—45-caliber; that the revolver was loaded, cocked, and concealed in his pocket. Some of these circumstances were referred to by counsel for the State, and the statement was made that a man who would do these things was worse than a rattlesnake, or more dangerous to the community than a rattlesnake. We are not attempting to give the exact language. This is the substance and meaning. The statement was not unwarranted. Nothing could be more dangerous than a man so armed, and in his frame of mind. It is said that a rattlesnake will, by warning, give a person a chance. It is not a fair statement of the record to say that we are "endeavoring to excuse the appeal to the jury to hang the defendant as they would stamp on the head of a rattlesnake."

Again, much is made of the reference, in one sentence in the closing argument, to a mob, and that defendant did not con-

template suicide. The word and sentence are not approved. Was it in answer to argument by the defense in reference thereto? We have no means of knowing definitely, since we have only one side of the question. Considering the connection in which the sentence was uttered, it is a proper inference that it was in answer to argument for the defense. Why should counsel for the State make the statement that defendant did not contemplate suicide, unless the defense had claimed that he did? The defendant put in evidence that a mob was threatened. There was some purpose in this. Being in evidence, it was a legitimate matter for discussion. The crime committed by defendant was an atrocious one. Suppose that, under such circumstances, as was altogether likely, there had been talk in the community, known to everyone, that a mob was mentioned. Did counsel for the defendant make the most of the circumstance, in his argument to the jury? Much could be said in defendant's favor on that proposition. The evidence shows substantially that defendant gave himself up to the officers; that he came to the jail in a high-powered automobile. Did the defense argue that his giving himself up was a circumstance tending to show that he was not guilty of any crime? Did they argue that he could have escaped in his car? We have no means of knowing, since we have only one side of it, and it is impossible to determine, from a one-sided presentation, whether the trial court, having heard it all, and having overruled the motion for new trial on the ground of the alleged misconduct, erred in overruling the motion for new trial, and abused its discretion. We think that, without any report of the argument for the defense, we should not say that the presumption of right conduct and right action on the part of the trial court has been overcome. It was in connection with these and other circumstances shown in evidence that counsel for the State referred to the mob. The argument was substantially this: That, though defendant had a swift car at hand, he may have concluded that, in these days of the telephone, it would be impossible for him to escape; that he gave himself up because he could not escape, and for his own safety. And in this connection, the statement was made upon which it is claimed that this

.case should be reversed. This, we take it, is the principal ground of complaint. Is it an unwarranted argument by the State to say that the defendant gave himself up because he could not escape, or to protect himself from violence, rather than because of some claimed consciousness of innocence? We cannot think so.

Going back now to some of the closing argument, to show that counsel conceded that the defendant was entitled to a fair trial, and asked that he be given a fair trial, and to show that much of the argument was claimed to have been in response to argument for the defendant, counsel for the State, Mr. Duke, said, among other things:

"Counsel for the defense have made a mistake when they said to you that I was one of the greatest lawyers in southern Iowa. This is the second case in all the eighteen years I have practiced law where I have ever been on the prosecution. I am not a prosecutor, and don't make any pretensions along that line. I sometimes regret that my friend Mr. Steck wasn't prosecuting this case in my stead, and I am sure that you would have heard a more able prosecutor than I. It is a hard proposition for a man who has been on the defense of criminal cases all his life to turn around and become a prosecutor. There is a duty incumbent upon me to do the best I can in this case. One thing mentioned by Mr. Rankin [of counsel for defense], he said that we have all the machinery of the state back of us in this case, and we can get witnesses and do this and do that. What a wonderful country we have in this respect! In this country of ours, no matter who the man is that is accused of crime,— it makes no difference what his color or race, white or black,— that he has the equal protection of the laws. Not only that, but he has the right to be represented by counsel, and to have witnesses subpoenaed in his behalf. I think Mr. Rankin simply overstepped himself a little when he spoke about there being witnesses they could not get. That wasn't true. When you stop to think of the fairness in which this case has been conducted as towards this defendant, it is a wonderful thing our laws safeguard the rights of the defendant. And it is well that they should safeguard the rights, not only of this defendant,

but every other defendant, regardless of race or color. In addition to this, defendant selected his own attorney, Mr. Rankin, to defend him,—Mr. Rankin, a gentleman of good character, a member of this bar for years, and who has had a great deal of experience. In addition to that, defendant's rights were safeguarded to this extent: that, in addition to having Mr. Rankin, Captain Steck was also appointed to defend,—Captain Steck, a man whose father was a great lawyer; a man who has had experience, having been prosecutor for four years; Captain Steck, a man who carried a captaincy commission in the United States army, and who had the honored position of being state commander of the American Legion. In other words, defendant has had the benefit of two as high-class men as you can select, to represent him. Another thing, the defense opened their case with Mr. Burris on the stand by showing his education. They showed that he had graduated from the public schools of the state of Missouri. That state had gone to the expense of providing separate schools for the colored children. Every colored child in this city or state or any other state should have the same privilege with reference to education as everybody else. It is perfectly right that they should have education. The evidence further shows that defendant attended college for a year; that he studied business methods, took a business course, and that he took perhaps a year in the study of architecture. Now, then, here's the point: Is that in his favor when you come to consider the crime that this man has committed? The defense talks as though this was a matter in his favor. I say that this man Burris is incapable of gratitude, it occurs to me, for what has been done for him. Defendant said on cross-examination that he had studied history. I wonder if, before he armed himself with a 45-caliber army revolver, in violation of the laws of the state of Iowa, I wonder, according to the statement made by his own counsel, that his general moral character was bad before ever this crime was committed, and they admit it; and I wonder, as he studied the history of this country, if he ever stopped to realize what it means to live in a great country like this, or to think that the colored race in the main,—that the Civil War was not fought so much over the question of states'

rights, as over the question of emancipation of the American negro. I wonder if he ever stopped to think that he might have the equal protection of the laws of this land, and others of his race, to read and to think that, at the battle of Shiloh, 10,000 brave men died * * * I wonder if he ever stopped to think and take into consideration what has been done for him by this state that furnished him Dan Steck, one of the finest members of this bar or in the state of Iowa. Now, then, the very fact of this defendant being educated shows that this defendant knew right from wrong. This is not so as to all negroes, some of whom may be uneducated and ignorant of what is right and what is wrong. But I say that defendant in this case, educated as he was, who deliberately and premeditatedly shot down a couple of defenseless women, is a dangerous man. I say that a man who arms himself with a 45-caliber revolver, in defiance of the laws of Iowa, and carries it with him and takes it with him day and night,—and, according to his own evidence, he carries it on his person, and according to his own counsel, he carried that gun cocked and locked,—I say that that kind of a man, white or black, is a menace to society. I say that, when that man, in addition to carrying that gun in violation of law, that he shoots down a couple of defenseless women, that man is a menace to society, and that he should be taken from society, just the same as you would stamp your foot upon a rattlesnake. A rattlesnake is not any more dangerous to society than a man who carries a 45-caliber revolver, cocked and locked, and then shoots down a couple of defenseless women. * * * I am not saying anything against the colored race as a race. In a great many respects, it is a remarkable advancement they have made during the last sixty years. The majority of the colored race don't approve of anything of this kind. They are, to a great extent, a peaceable and law-abiding people,—good people. I do not say this man is a representative type of the colored race. He is not. * * * Mr. Steck and I sat across the table during four years that he was prosecuting cases and I was defending. Many times, when Mr. Steck got me in a tight place, I would undertake to try the State's witnesses, and would talk about everything else that I could except the defendant, in order to deter

the minds of the jury from the defendant. I see that Mr. Steck has been a very apt pupil of mine, and that he is using some of my tactics against me. There is not any question about that. *He has made every attempt that he could to draw your attention to something else,*—to some of the *State's witnesses.* * * * I am going to spend some time discussing the State's witnesses, because I think it is necessary, to show that they spoke the truth. The evidence shows, from Mrs. Allen's testimony, that this girl that he had been going with,—only a twenty-year old girl, and defendant several years her senior,—that this girl had made a statement at one time, when she had a Bible in her hand, and she called defendant's attention to what they had been doing, that they had been violating the commandment with reference to adultery; that she said to defendant, 'You told me one time that you were going to be hard to get rid of.' That conversation took place before this killing, several days or weeks. I am inclined to think the evidence shows that, at least the night before, the defendant and his wife were having trouble over his relations with this woman. It is a peculiar circumstance in my mind that, three days previous to the killing, he wanted a gun so badly that he went down to the pawnshop, and went so far that he went up and got Dora McGee and got her to stand responsible, or as surety, for the revolver. Now, then, the question in my mind is this: What did he have in mind? He had been carrying a revolver for several weeks. He claims he lost the gun, some two or three weeks previous; but for some unaccountable reason, he wants a gun so badly he gets Dora McGee to come down and stand responsible. * * * I think he had murder in his heart when he purchased that gun only three days before this terrible disaster. I believe he was premeditating on something of this kind. * * * They speak about Glen Yates. They would have you believe that Glen Yates·is not telling you the truth. I do not know anything about Yates. I do not know if he ever was convicted of a felony. If he was, they never took the trouble to bring out what felony it was. I think perhaps it was some boyish prank.

"Steck: That is objected to.

"Court: I think, Mr. Duke, you cannot discuss the fact; that there is no evidence here showing what the felony was.

"Duke: I withdraw the argument.

"Now then, gentlemen, in any event, what motive could Yates have in coming up here and testifying falsely? According to Mr. Steck's own admission, it was a very important piece of testimony. Mr. Steck says it shows premeditation if defendant, while talking with this woman, said, 'Did you ever stop to think that you might die sometime?'"

Counsel then proceeds to discuss the evidence of Yates at some length, and said further:

"It is a peculiar circumstance that they claim Glen Yates has *committed perjury* here. They are claiming that a former sheriff has *committed perjury,* and that he has sworn to things that weren't true. They claim that Charley Dutton didn't tell the truth when he said that defendant made the statement that he had done a coward's act, and shot a woman. How does it happen they claim that, when Bright testified to that effect? Deputy Sheriff Bright asked defendant the question: 'Did you really shoot a woman?' and defendant said, 'Yes.' And he asked him why, and he said, because he was sore. It is a peculiar thing that they ask you to take this defendant's word, and they ask you to make a *perjurer* out of Yates, and ask you to disbelieve former Sheriff Giltner. They ask you to disbelieve what Griffin, state agent, said. They ask you to disbelieve Charley Johnson and the Allen woman as to what took place. They ask you to disbelieve all these, and take the word of the defendant. He had lied to his wife; he knew his falsity had been discovered; when those two women were out talking about him, he knew it. What right did defendant have to go out there where those two women were? Nobody asked him; nobody invited him to come out there. Why did he put himself in the presence of those two women, armed as he was?"

It should be said that defendant testified:

"When I walked into the room, my wife said, 'What did you come up here for?' I said, 'I came up to straighten up them lies you-all been saying I was telling.' I was talking to my wife. My wife said, 'Well, you needn't to come out to

straighten them up. You have been telling lies; you know you have.' "

The argument continues:

"Now, Mrs. Burris told defendant to take the car home, and take his clothes and go. Then he turned around to this twenty-year old girl, and wanted to know whether she was through with him, too, and the poor girl replied that she was; that he had lied to her, and that he had lied to his wife, and that she didn't want to have anything more to do with him. Then, to show you that this was a willful, premeditated act, what further did he do? The evidence shows that he stepped back, and said, 'So you are all through with me, are you?' In addition to this, his wife called his attention to the fact that he had this gun, and he said he didn't have it; and he knew that he did; and she told him that he was a coward, because he had threatened her with that gun before. * * * They talk about Charley Johnson. I am not here to defend Charley Johnson, if he is the kind of a fellow they say he is; but it is peculiar that they didn't do something, or that society is not rid of that kind of a fellow, if he is the kind of a fellow they say he is. * * * They talk about Mrs. Allen. They lay hold of a circumstance with reference to this little woman before she was married. I do not know anything about her character or reputation, but the evidence shows that, for four years, she and her husband had lived here in Ottumwa, and, so far as I know, they are law-abiding citizens. The only thing we know is that defendant was permitted to go there to see her sister. That is the worst thing we know of her doing. * * * Now the evidence in this case shows that defendant wasn't contemplating suicide. He thought too much of his own hide to ever undertake to commit suicide. * * *"

At this point, the abstract shows that the reporter was not taking the argument; but certain objections were made, and in some cases they were overruled, and in others sustained, and counsel withdrew the statement. The evidence shows, without objection, how defendant spent his wages, and that he had not lived with or supported his wife and children,—a discredit-

ing circumstance, affecting his credibility as a witness. In closing, counsel said:

"I say, in the interest of the colored race in Ottumwa, in order to protect them, and to protect the balance of the people, what right has a man of this kind to live? * * *I am not asking the death penalty for defendant because he is a colored man. I would ask it just as soon of any white man who had committed such a crime. Gentlemen, it is not for me to say,—it is up to you to say whether or not this man should have the death penalty."

We have set out but a small part of the argument, but enough to show that, barring one or two exceptions in the heat of argument, the closing argument as a whole was not intemperate.

There can be no question but that the evidence was sufficient to sustain a finding of guilt. His excuse that the shooting of deceased and his attempt to. kill his wife were accidental is without merit. Defendant not only took the life of the deceased, but, as well, attempted to kill his own wife. This is the second trial and second appeal of this case. Under these circumstances, the case ought not to be reversed unless there is substantial and prejudicial error. The rights of the public, as well as of the defendant, are entitled to consideration. To reverse the case again upon trivial grounds would subject our laws and the courts to criticism. They are the best in the world, but there is an occasional miscarriage of justice. Much of the criticism is unjust and unwarranted. It must be conceded, however, that, as said by Mr. Chief Justice Taft not long since, in the trial of our murder cases there is some ground for criticism.

In the instant case, the defendant's written confession and all the evidence in the case show beyond any doubt that he is guilty, as charged. Would it be anything but a miscarriage of justice to reverse this case? It is indeed difficult to see it in any other light.

We have said that mere misconduct on the part of counsel is not enough alone to require the granting of a new trial, unless it appears so prejudicial as to deprive the complaining party of a fair hearing of his case by the jury, on the evidence. *State*

*v. Thomas,* 135 Iowa 717, 729. We also said, in *State v. Sale,* 119 Iowa 1, 5, that we were compelled to admit that portions of the argument seemed intemperate and unnecessarily violent in their character, but that we did not have in the record the argument of counsel for defendant in addressing the jury, and had no means of knowing to what extent the argument of the prosecuting attorney was justified or excused by the presentation of the defendant's case; that, moreover, no exceptions were taken to the prosecuting attorney's argument at the time, and that the objection cannot be first made in the motion for new trial, when, if it had been promptly made, the court might have restrained any undue zeal on the part of the prosecuting attorney, and thus have prevented the prejudice which is afterwards claimed to have resulted; that, under the circumstances, we should not grant a new trial on this ground. See, also, *State v. Wilson,* 157 Iowa 698, 722. We are not herein departing from prior decisions, but adhering to them.

In the instant case, there appears to have been practically no objection to the argument at the time, so that the court could have stopped counsel if he went too far. What argument did counsel for defendant make, in appealing to the jury and to their prejudices and defendant's color and his disadvantages, in an effort to secure an acquittal? We have no means of knowing. No doubt we are compelled to reverse in some cases where a reversal would not be had if we were placed in the same position as the trial judge. Under the statute, the trial judge was necessarily present at all stages of the trial of this case. We have said many times that, because the trial court did hear all the arguments, and overruled the motion for new trial, there is a large discretion vested in the trial court in ruling on such a motion, and that this discretion will not be interfered with·unless abused. In this case, how can it be ·determined whether the trial court abused its discretion, or how can it be determined that what was said by counsel for the State was not in response to arguments advanced by the defendant? Counsel in such cases are usually evenly matched; and each is striving to the best of his ability, one to convict, and the other to secure an· acquittal. We have no doubt that counsel for defendant used

his ingenuity and generalship in presenting his side of the case to the jury. Because the trial court was in a position to know more about it than we can, and because of the finding of the trial court, to which we give weight, it is presumed, nothing appearing to the contrary, that argument by the prosecutor was a legitimate response to argument for the defendant. *State v. Cameron,* 177 Iowa 379, 381; *State v. Christ,* 189 Iowa 474; *State v. Browman,* 191 Iowa 608, 635; *State v. Bird,* 196 Iowa 474. See, also, *Reed v. State,* 141 Ind. 116 (40 N. E. 525, 527), where it is said:

"It is not disclosed by the record that the statements of appellant to the jury were not referred to, or made use of, by his counsel in their argument in his behalf, and, as we are bound to indulge all reasonable presumptions in support of the action of the trial court, we must presume that counsel did exercise this right," etc.

At any rate, there is surely no presumption against the ruling of the trial court.

"The solemnity which attaches to judicial proceedings, and the care of the state in its judicial department that causes shall be conducted with almost inflexible regularity, are by no means ephemeral, but carry with them the presumption thereafter that such proceedings not only should have been, but were, regular in form and proper in conduct. * * * A superior court of general jurisdiction, proceeding within the general scope of its powers, is presumed to act rightly." 1 Jones's Blue Book of Evidence, Section 31.

There is usually more or less exaggeration in argument by both sides. We said in *State v. Hasty,* 121 Iowa 507, 520, that hyperbolical expressions have been indulged in always, and probably always will be, and that it would be undertaking too much to vindicate all expressions of opinion made in the heat of argument, and that this is not essential, to sustain a conviction. If the language was not calculated to unduly arouse the passions or divert the jury from the proper discharge of their duty, the verdict should not be disturbed, even though the language used was disapproved. See, also, *State v. Browman,* 191 Iowa 608, 636.

Digressing a moment to the alleged misconduct in cross-examination of this defendant. It may be conceded that it was immaterial that the McGee woman went surety for the purchase of the revolver; but we are unable to see how there could be any prejudice in that. The principal purpose of showing the revolver transaction, some days before the killing, was to show preparation and premeditation on the part of the defendant. This was legitimate and proper. The question as to the McGee woman's being a white woman was objected to, and the objection sustained. However, it would have been perfectly proper to have placed her on the stand, to prove the purchase of this revolver. In that case, the jury could see whether she was white or colored. It could not be claimed that so putting her on the stand would be error. In *State v. Tippet*, 94 Iowa 646, 654, it was held not to be misconduct for the prosecutor to refer to the fact that the murdered man was dead, and that he could not tell his side of the story. This court said that that was a fact known to everyone concerned in the trial. As said, the matter of purchasing the revolver was properly brought out on cross-examination, for the purpose indicated. The same rule applies to the cross-examination by a defendant of any other witness, as to matters affecting credibility. *State v. Kuhn*, 117 Iowa 216, 229; *State v. Red*, 53 Iowa 69.

It is thought by appellant to have been a serious matter that defendant was asked, on cross-examination, as to his relations and acquaintanceship with the McGee woman, and whether he took her to see her husband when he was in jail. It is claimed by appellant that there was an intimation that she was white. One single question was asked, bearing on that, and the objection was sustained. There is no evidence that she was white, and the matter was not referred to in argument. As said, had she been placed upon the stand, the jury could have seen whether she was white or colored. The defendant did take the stand, and the jury could see that he was colored. It does not necessarily follow, even if it be true, that the fact that defendant and a white woman were seen together, and that he took her to her husband, would be improper. If her character or the character of defendant was such as that being seen together would

discredit him, that was legitimate cross-examination, as affecting his credibility as a witness.

It is proper to ask a witness, on cross-examination, whether his residence is in the jail. *State v. Pugsley,* 75 Iowa 742. A defendant, as a witness, on cross-examination, may be required to answer discrediting questions, for the purpose of impeachment. *State v. Brandenberger,* 151 Iowa 197, 204; *State v. O'Brien,* 81 Iowa 93. It is largely a matter of discretion on the part of the trial court. *State v. Brandenberger,* supra; *State v. Seery,* 129 Iowa 259.

As to the argument that defendant went to the pawnshop in order that he might buy the automatic revolver, and that for some unaccountable reason he wanted a gun, for some purpose, and that the prosecutor believed that, back there three days before the crime was committed, defendant was premeditating something of this kind, this argument was not improper. In the *Tippet* case, supra, at 653, it was stated in argument that the defendant fixed the revolver for some purpose, and that he fixed it so that it would be sure to go off. It was shown that, prior to the shooting, defendant and another had fixed the revolver, and the conclusion that the county attorney deduced therefrom, that defendant fixed it for some purpose so that it would be sure to go off, if not correct, was at least not unwarranted. We think that is true of what was said in the instant case.

It is unnecessary to discuss the argument as to the war. We think that no substantial ground is shown for a reversal as to this matter, when it is considered that this is a second trial; that the evidence is sufficient; and the other circumstances.

We find no error urged by the appellant which requires reversal of the judgment. It must be, and it is,—*Affirmed.*

ARTHUR, C. J., EVANS, STEVENS, DE GRAFF, and VERMILION, JJ., concur.

FAVILLE, J. (dissenting). I. I cannot concur in the conclusion announced by the majority on the question of misconduct of counsel for the State. The case is of such great importance, and the conclusion of the majority is such a radical

departure from the former holdings of this court and many others, that I deem it not improper to state my reasons for dissenting from the pronouncement made.

I know of no more solemn and important duty that can be imposed upon this tribunal than that of determining whether or not one whose life has been adjudged to be forfeited has been tried in accordance with established rules of procedure in criminal cases. I do not think it is a proper function of this tribunal to determine criminal appeals on the basis expressed in the majority opinion, that "this is a second trial and a second appeal of this case." The majority say:

"In the instant case, the defendant's written confession and all the evidence in the case show beyond any doubt that he is guilty, as charged. Would it be anything but a miscarriage of justice to reverse this case? It is indeed difficult to see it in any other light."

I confess I cannot see it in any *such* light.

I differ from my brethren of the majority in the views above set forth and repeated in various forms throughout the opinion. I do not understand it to be the function of this court to determine in our own minds whether or not we think a defendant is guilty, and, if satisfied of his guilt, then to affirm a case. I hesitate to declare it to be the rule of this tribunal that to reverse a criminal case because of substantial and prejudicial errors committed upon the trial is "a miscarriage of justice," even if we believe the defendant to be guilty, and even if it is a second appeal.

The statute, Code Section 5462, requires this court, in a criminal case, to "render such judgment on the record *as the law demands.*"

Except where the insufficiency of the evidence to sustain the verdict is made a ground of reversal, heretofore we have determined criminal appeals on questions of law, and not as triers of fact to determine the guilt or innocence of the defendant. I do not regard it as "a miscarriage of justice" that even the guilty shall be tried "as the law demands." Nor do I regard the fact that this is "a second appeal," justification for the

overruling of precedents and the establishment of new rules of criminal procedure.

This appeal involves no "hair-splitting technicality." It goes to the basic and fundamental proposition of the right of one accused of crime to have a fair and impartial trial in accordance with well established rules of law. If this has been denied, I think we should reverse, even though there has been a second conviction, and even though we may believe the defendant to be guilty. There is still virtue in the saying that "two wrongs never make a right."

The guaranty of a fair and impartial trial to one accused of crime is of the very genius of our institutions. It cannot be denied to the humblest citizen without doing violence to the very fundamentals of our American conception of the rights of men.

Was the defendant in this case denied a fair and impartial trial? If the precedents still have efficacy, I think there can be but one answer, upon the record.

The majority do not cite a single authority in any way analogous to the record in this case, to sustain their conclusion. None such exist. We are "pulling down the bars" by this decision, sanctioning a new method of trying criminal cases, not heretofore countenanced, and declaring that criminals may now be tried in Iowa by methods heretofore unhesitatingly disapproved and condemned. Against such an innovation I can only raise a voice of protest.

In this action, the defendant was charged with murder in the first degree. This furnishes the sole and only exception known to our law where the jury not only determines the guilt or innocence of the accused, but, if he is found guilty, fixes the penalty to be imposed. Code Section 4731.

Where a trial court has a discretion in the imposition of a sentence, we have power to modify it on appeal. Code Section 5462. It is doubtful if we possess any such power where the jury fixes the penalty. At least we have never assumed to have it. So, in this particular situation, we are dealing with the one instance known to our law where the jury imposes the penalty, and where the extent of the penalty so imposed is not subject

to judicial review. This situation, and the fact that in such a case a defendant is on trial for his life, are considerations which, in my judgment, impose upon us the most grave and serious responsibilities that can be placed upon a court.

The jury, in this case, was confronted with a twofold duty: one, to determine the question of the guilt or innocence of the defendant; the other, to fix and determine the penalty that should be imposed, in the event that the defendant was found to be guilty. The evidence upon the trial and the arguments of counsel should, in such a case, be properly directed to the enlightenment and aid of the jury in performing this double duty. Proper and legitimate evidence on the question of the guilt or innocence of the defendant should always be received in such a case, and legitimate and proper argument to assist a jury in their duty should be indulged in. Anything outside of this, in either evidence or argument, should have no place in a trial of such solemnity and vast importance.

As I view it, the record in this case shows transgression by the prosecution in both respects: in the introduction of improper and prejudicial testimony, and in the making of inflammatory, prejudicial, and improper argument to the jury. The paucity of statement regarding these matters in the opinion of the majority makes it excusable that the record be set out, to some extent.

I take up first the question of the admission of improper testimony.

Let it be remembered that the defendant was a colored man, on trial for killing a woman with whom it was claimed he had been intimate, in violation of his marital vows. The State, as it had a perfect right to do, produced the revolver with which it was claimed the shooting had been done. The revolver had been surrendered by the defendant to the sheriff, and no question whatever was raised as to its identity. The State, however, called the witness Meyers, to prove that he had sold the revolver to the defendant. Without objection, he did so testify, and fixed the time and place of the sale. He was then asked to whom he delivered the revolver, and, over the objection of the defendant, testified, "To a woman by the name of Dora

McGee." A motion to strike the answer was overruled. He also produced a paper, which was identified as Exhibit B, and which he testified was given to him at the time the revolver was purchased, guaranteeing the money for the gun. A motion to strike this evidence was overruled. He was asked who signed the paper, and, over proper objection and motion to strike, was permitted to answer, "Dora McGee." Also, over objection, he was permitted to testify that the defendant and Dora McGee came to his store together, and left together.

The defendant was a witness in his own behalf. On cross-examination, the special prosecutor began to interrogate the defendant in regard to the woman Dora McGee. The following took place:

"Q. You knew that she was Charley Dutton's wife, didn't you? A. No, sir. Q. You knew her name was Dora McGee, didn't you? A. They called her Dora McGee, and they called her Mrs. Dutton. I do not know which is her proper name. Q. You knew that she was married to Charley Dutton? (Objected to as immaterial, and not cross-examination. The court: Objection sustained. Exception.) Q. And that she was a white woman? (Same objection. The court: Objection sustained. Exception.)

"Daniel F. Steck: I want to object to counsel asking the question, as being improper, and counsel knows that it is an improper question to ask this witness on cross-examination.

"Lloyd L. Duke: Withdraw that question.

"Q. Now, you got the gun of Sol Meyers? A. Yes, sir. Q. And this woman stood good for it? (Objected to as not proper cross-examination. The court: Objection sustained, as not proper cross-examination.) ·

"Daniel F. Steck: I wish the court would caution counsel that it is improper cross-examination, and that he should refrain from it."

Immediately after this, however, the following took place:

"Q. And yet you and Charley Dutton were on intimate enough terms that you brought this woman, whom you said was called Mrs. Dutton sometimes, and Dora McGee sometimes, back and forth to see Charley Dutton when he was in jail? (Objected

to as argumentative and not proper cross-examination. The court: Objection overruled. Exception.) Q. Isn't that true? A. Yes, sir. Q. And you were on good enough terms with the woman that you say was Dutton's wife, that she stood responsible for you when you bought this 45-caliber automatic revolver? (Objected to as improper cross-examination. Objection sustained.)''

Not content with this, in argument to the jury the special prosecutor said:

''Now, then, it is a peculiar circumstance, in my mind, that, just three days previous to the killing, that this fellow wanted a gun. He wanted an automatic revolver so badly that what did he do? The evidence shows this: That he went down to the pawnshop, in order that he might buy an automatic revolver; that he selected a revolver there, and he even went so far that he went up and got Dora McGee, who lived up over the pawnshop, or somewhere in that vicinity, and got her to stand responsible, or to stand as surety for that revolver. Now, then, the question in my mind is this: What did he have in mind? What was the necessity of his having the revolver? He had not been carrying a revolver for several weeks previous to that. I believe he claims that he lost the gun, some two or three weeks or more previous to that, but, for some unaccountable reason, he wants a gun so badly, for some purpose, and to the extent that he goes up and gets Dora McGee to come down to that pawnshop and stand responsible for the payment of the gun. * * * I believe that, back there three days before this crime was committed, that he was premeditating on something of this kind; else why should he have been so anxious to have an automatic revolver that he went and got Dora McGee to come down there and stand surety for the buying of that gun? * *. * They claim that Charlie Dutton,—and this fellow was hauling Dora McGee back and forth, to the jail and home again, and was evidently on friendly terms with Charlie Dutton.''

No one reading this record can have any misgivings whatever about the purpose of the attorney for the State in pursuing this course. It was not done innocently, unwittingly, or inadvertently. It was a studied, deliberate, and intentional pur-

pose to bring into the case, by improper examination of the State's witness Meyers, by improper cross-examination of the defendant, and by wholly improper argument, a matter that was entirely foreign to the case on trial, and that could not be otherwise than highly prejudicial. The majority attempt to excuse this conduct and to hold that it was nonprejudicial. It is the very kind of conduct that we held constituted reversible error, upon the former trial of this case (194 Iowa 628, 636). No one can read this record and escape the conclusion that the State was deliberately and intentionally trying to impress upon the jury, by this line of procedure, that the defendant, a colored man, had been untrue to his marital vows, and in addition to that, had been consorting with a white woman whose husband was in jail, and that he was on such familiar terms with her that she had become surety for the payment of the revolver which he owned, and that he was driving her back and forth to the jail. No one can be so obtuse as to believe for a moment that this evidence, forced into the record over repeated objections, and reiterated in argument, was a "mere inadvertence," and was "incidentally received in evidence." The conduct was more flagrant than that which occurred in the former trial of the case, and for which we granted a reversal. There might have been some excuse for the attempt in the first trial to drag into the case irrelevant matter of this kind, to reflect upon the defendant, but there was no excuse for it upon the second trial. The only way that the decision on the former appeal was sought to be evaded by the prosecutor in the retrial was to select some other white woman about whom to cross-examine the defendant. All the change, in effect, that the State made between the former trial and this trial was that it saw fit now to abandon the interrogatories about the other white women with whom it claimed defendant had been riding, and to substitute a new white woman in their place.

I am not prepared to hold that the decision of this court in the former appeal in this case can be evaded in any such manner. Upon this record alone, without more, I think we should unhesitatingly reverse this case, and not permit the ruling of this court to be evaded by any such transparent make-

shift. That it is misconduct to persist in propounding improper questions having a tendency to discredit a defendant in the eyes of the jury, has heretofore been regarded as too well grounded in the law to require citation of authorities to sustain it.

In *State v. Scott,* 194 Iowa 777, we recently had a case before us that involved exactly this kind of misconduct. A man charged with murder was asked if he had not been named after the confederate general, Robert E. Lee; if he did not have Indian blood in his veins; if he had not shot a man in Missouri, and killed another in Arkansas; and other similar questions. Speaking by Mr. Justice Evans, we said:

"If a case were close and doubtful in a material respect, and if the unwarranted conduct is calculated to obscure the point and to deflect the minds of the jury away from it, rather than to invite candid consideration of it, we must, of course, find prejudice more readily than otherwise."

We reversed for this misconduct in the examination of the defendant. If the conduct of counsel in the persistent asking of improper questions for no other ostensible purpose than to prejudice the jury against the defendant is now to be sanctioned as nonprejudicial, and as proper practice, under a guaranty of a fair and impartial trial, then we should unhesitatingly declare that we were in error in reversing this case before, and should courageously overrule *State v. Scott,* supra, and similar cases. This I am not prepared to do.

My views that the misconduct in this respect was a denial of a fair and impartial trial are sustained by abundant authority. I cite but a few, by way of illustration. *Gale v. People,* 26 Mich. 157; *People v. Wells,* 100 Cal. 459, 462 (34 Pac. 1078); *People v. Cahoon,* 88 Mich. 456; *Leahy v. State,* 31 Neb. 566; *State v. Trott,* 36 Mo. App. 29; *People v. Mullings,* 83 Cal. 138 (23 Pac. 229); *People v. Ah Len,* 92 Cal. 282 (28 Pac. 286); *Wyatt v. State,* 58 Tex. Cr. 115 (124 S. W. 929); *People v. Teiper,* 186 App. Div. 830 (175 N. Y. Supp. 197); *People v. Manganaro,* 218 N. Y. 9 (112 N. E. 436); also, dissenting opinion of Kenyon, circuit judge, in *Wild v. United States,* 291 Fed. 334.

II. The misconduct of counsel for the State, however, was

by no means limited to the matter I have just discussed. The argument to the jury was inflammatory, and so prejudicial as to be a denial of a fair and impartial trial, and to require a reversal of the case. It is impossible, within the reasonable length of an opinion, to set out any more than a few excerpts from the argument, which are illustrative of its character and purpose. After a lengthy discourse to the jury about the opportunity the defendant had had for acquiring an education at the public schools of the state of Missouri, where he had formerly lived, the argument then proceeded:

"I say that this man Burris, this defendant in this case, is absolutely incapable of gratitude, it occurs to me, for what has been done for him. * * * I wonder if he ever stopped to think that the colored race in the main—I wonder if he ever stopped to think that that race of people—that the Civil War was not fought so much over the question of states' rights as it was fought over the question of emancipation of the American negro. I wonder if he ever stopped to think that, in order that he might have the equal protection of the laws of this land, and others of his race,—I wonder if he ever stopped to read, and to think that, at the battle of Shiloh, 10,000 of brave men died, in order that this man might have the protection of the laws, and others of his race. Didn't they give their lives? I wonder if he ever stopped to think, gentlemen, that, in the battle of the Wilderness, again 10,000 men were killed there. I wonder if he ever stopped to think that, on the field at Gettysburg, again thousands of men gave up their lives in order that the negro might have the protection of the laws, and that he might be emancipated. I wonder if he ever stopped to think that, as Abraham Lincoln stood at Gettysburg, after the battle of Gettysburg had been fought, and delivered his Gettysburg address, that even then, according to Abraham Lincoln's statement, it was in doubt whether or not a union of the people, by the people, and for the people, should not perish from the earth; and that they were fighting, those men, fighting and dying for the benefit of the colored people of this country. I wonder if he ever stopped to think that, at Cold Harbor, General Grant lost 10,000 men in twenty minutes. Think of it, gentlemen, 10,000 men in

twenty minutes were dying in battle of Cold Harbor,—and why? In order that slavery should be put down, and in order that these people might have the equal protection of the laws. * * * The state has furnished him with counsel and with any witness and every witness that they desired here. I wonder if he is not guilty of base ingratitude to the country in which he lives. * * * Gentlemen, I want to say to you that, whenever a 'Smokey Row' negro, as we sometimes speak of them,—whenever a 'Smokey Row' negro gets into some trouble, or it may be a crap game, or it may be something that is a violation of the law, a great many times, gentlemen, I am frank to say that I feel sorry for them, because, in a great many instances, he has not had good home surroundings, and because, in a great many instances, he is absolutely ignorant, you might say, of what is right and what is wrong. A man of that kind, a negro of that kind, is entitled to some consideration; but I say that the defendant that we have in this case, who deliberately and premeditatedly shot down a couple of defenseless women, and that man is educated to the extent that he has graduated from the public schools of the state of Missouri, and has been a year in college, and he knows the history of this country, and who knows what has been done for him, I say that he is a dangerous man. * * * I say that that kind of a man, white or black,—it don't make any difference whether he is white or black,—I say, gentlemen, that, when that man has stepped further, and in addition,—and I say that that kind of a man is a menace to society. I say that, when that man has stepped further, and in addition to carrying that gun, in violation of law, that he shoots down a couple of defenseless women, I say, gentlemen, that man is a menace to society, and that he should be taken from society, just the same as you would stamp your foot upon a rattlesnake,—upon the head of a rattlesnake. * * * What consideration is he entitled to? Gentlemen, I don't care what consideration. He has been given every consideration that should be given a man. The fact of the matter is that he has been given too much consideration. That is the truth of the matter. I am not saying anything against the colored race, as a race. In a great many respects, it is a remarkable advancement they

have made during the last 60 or 80 years. It is a remarkable thing, I say, that the majority of the colored race don't approve of anything of this kind. They are, to a great extent, a peaceable and a law-abiding people,—set of people. They are, to a great extent, good people. I do not say for a minute that this man is a representative type of the colored race. I say he is not. And I say this to you, gentlemen, that the quicker that the colored race is rid of the men of the type of the defendant, Burris, and the quicker they are gotten rid of, then that much quicker will be the benefit to the colored race. * * * Did you ever stop to think that there is very few colored men on the jury, and none on this jury? Did you ever stop to think that the white race, being the predominating race, that we have to enforce the laws for the colored race? That is, in the main, and to a great extent. Now, then, it is up to us, and it is up to the white people of this community, and it is up to this jury here, to uphold the standard of the colored race. They are looking to us not to turn a criminal loose on society, but to administer justice in this case. * * * He knew, according to his own evidence in this case, and according to all the evidence in this case, that he was living over there at home and eating three meals a day over there in a house, according to his own evidence, that belonged to his mother-in-law. And he was operating a car, according to his own evidence, that belonged to his mother-in-law; and yet, you might say that the uncontradicted evidence in this case shows that he wasn't even supporting his wife and his three children. Now, there is the type of a fellow. What right did he have? * * * This fellow was a murderer at heart. He didn't care what he had done. The evidence in this case shows that he never, at any time, as far as we know, ever expressed any repentance. He had never yet at any time showed any trace of repentance or remorse for his act. * * * There wasn't any chance for him to escape, and he knew it. And not only that, but he probably feared and knew, deep down in his heart, that he ought to be mobbed, and probably felt this way about it: that there might be some danger of a mob form; but he looked after his own protection. What did he do? He calmly and deliberately drove up to the Wapello County jail, then, in order

to save his own hide, and asked to be locked up. * * * It was nothing less than cold-blooded, deliberate murder. If you believe Charlie Dutton, and you believe John Bright, it was nothing more or less than a cold-blooded murder that this man committed; and he, even after he had committed this murder, went and got himself locked up in jail, so that nobody could get hold of him. That is what he did. It shows how cold-blooded and deliberate the fellow was. * * * I say that that girl is all right, and believe her, in preference to a cold-blooded murderer like Archie Burris. * * * Now, the evidence in this case shows that Archie Burris wasn't contemplating suicide. The evidence shows that he thought too much of his black hide, when he came up after committing this murder and asked to be locked up. He thought too much of his own hide to ever undertake to commit suicide. * * *

"Appellant's counsel: I object to counsel commenting on the fact that, in his opinion, it is not sufficient punishment to send a man to penal institutions for life, because that is a penalty which is provided by our law. I do not believe it is a subject of comment by counsel.

"The court: Objection overruled. (Exception.)

"Appellant's counsel: I object to counsel arguing along this line, as to the number of murders committed in this country, and what punishment should be set up, as not applicable to the case.

"The court: Objection overruled.

"Appellant's counsel: I object to counsel commenting on the fact that this defendant has not entered a plea of guilty, but has taken a trial, as he is entitled to, under the law. I do not believe it is proper argument.

"The court: Objection overruled. * * *

"You can't tell me, gentlemen, that there is any wrong,— that there is any reason why a jury of twelve men, who have found a defendant guilty of murder in the first degree, should let any religious or conscientious scruples interfere with the performance of their duty. I want to tell you that that wife and those three children and those three children are better off without Archie Burris than they are with him. The evidence

shows that he passed up his chance to support that wife and to support those three children. He has let that chance pass by. * * * He has let the time pass by for mercy and for leniency. I say, in the interest of the colored race here in the city of Ottumwa, in order to protect them, and in order to protect the balance of the people here in this city, what right has a man of this kind to live? * * *"

The majority, if I read the opinion correctly, excuse this argument on two grounds: (1) That it was nonprejudicial; and (2) that it is presumed to have been in reply to the argument for the defendant, and therefore proper. To neither of these propositions can I subscribe. This was the closing argument in a case where a man was on trial for his life, and where the jury was vested with the exceptional and extraordinary power of determining the penalty to be imposed. No reply was available to defendant. I can conceive of no more important situation, calling for calmness and deliberate and unimpassioned judgment, than a situation where one is about to vote on the question of depriving a fellow citizen of his life. If inflammatory, passionate, and prejudicial appeals are out of place in any legal proceeding, it should be in such a case. Heretofore, in cases where a fine might be imposed, or a jail penalty inflicted, or in civil cases, where nothing but money or property were involved, we have unhesitatingly and repeatedly held that arguments of this character constitute prejudicial misconduct, for which a new trial would be promptly granted. We now propose to depart from this established and time-honored rule, and to hold, in a case where a human life is at stake, that conduct of this character does not constitute reversible error. I appeal briefly to the authorities.

In *Hall v. Wolff*, 61 Iowa 559, a suit upon a promissory note, counsel argued that the plaintiff was not the real party in interest, and that the animus of the case was the desire of the president of the bank to injure the intervener, and that plaintiff was only a cat's paw to lend the cloak of respectability to the case. We reversed the case for misconduct, even though no objections were made to the argument at the time of its delivery.

In *Wheeler & W. Mfg. Co. v. Sterrett*, 94 Iowa 158, a suit

on a promissory note, the attorney for the defendant argued that the plaintiff was a nonresident of the state, a wealthy corporation, and that defendant was poor, and that such a corporation should have its property confiscated, and that he was in favor of such a law. Plaintiff's counsel had an opportunity to reply to the argument, but still we reversed the case.

*Henry v. Sioux City & Pacific R. Co.,* 70 Iowa 233, involved a suit for personal injury. In argument, it was insinuated that the corporation which was being sued had procured an indictment against the plaintiff. We said:

"In cases of this magnitude, delicacy, and difficulty, courts should see to it, as far as possible, that the scales are held even, and that unwarranted charges or insinuations made before the jury should not, if insisted upon by the offending party against objection, be allowed to pass without rebuke."

I might ask: Are there any cases of greater "magnitude, delicacy, and difficulty" than those involving human life?

In *Goldthorp v. Goldthorp,* 106 Iowa 722, in the examination of a witness, the answer was given that the testatrix had a most remarkable mind for a woman of her age, and counsel for proponent remarked: "I agree with you. I have known her most of her life." We reversed the case because of this misconduct.

In *Sullivan v. Chicago, R. I. & P. R. Co.,* 119 Iowa 464, an action for personal injury against a railroad, in making the opening statement, counsel for plaintiff said:

"I shall not attempt to state to you the income of the Chicago, Rock Island & Pacific Railway Company, the defendant in this case, because it will not be in evidence, and it is not my purpose to make any statements to you here in this opening statement, with the exception of those that will be in evidence."

The remark was objected to, the objection sustained, and the court said it was improper matter to even call to the attention of the jury. We said:

"Jurors, as a rule, do not come to the trial of causes with minds trained to a proper discrimination between what are and what are not relevant matters; and, by reason of the lack of legal education and experience, they are oftentimes innocently,

and even unconsciously, controlled in their view of causes submitted to them by influences that would have no place in the consideration of one familiar with the ethics of the law, and accustomed to the work of legal decision.''

In *White v. Chicago & N. W. R. Co.,* 145 Iowa 408, where an appeal was made to the jury to return a large verdict because of the wealth of the defendant and the poverty of the plaintiff, it was held that this was reversible error.

In *Almon v. Chicago & N. W. R. Co.,* 163 Iowa 449, the suit was for damages for the loss of goods. In the closing argument, counsel for the plaintiff used the following language:

''I don't know of any reason why Mr. Hise, the attorney, should be unfair, unless it is because of the fact that he is connected with a corporation worth millions of dollars and engaged in a lawsuit against and trying to beat a poor devil.''

We held that this constituted reversible error, and sustained the opinion by many authorities.

In *Belcher v. Ballou,* 124 Iowa 507, speaking by Mr. Justice Weaver, we said:

''The further statements to the jury concerning a scandal in no manner connected with the case on trial, and the declaration that plaintiff's poverty and defendant's wealth had prevented the production of testimony, are too manifestly improper to require any more than their simple statement.''

In *Cvitanovich v. Bromberg,* 169 Iowa 736, suit was brought to recover the purchase price of liquor alleged to have been sold. Questions were asked with regard to defendant's becoming rich by the taking of orders for other beer and whisky, and misconduct in argument to the same effect was urged. This court, speaking by Mr. Justice Preston, said:

''We think these two exceptions must be sustained. We had always supposed that litigants were entitled to a trial of their cases on the merits, regardless of the question as to whether they are rich or poor.''

I might prolong the citations to great length. Heretofore we have spoken on this subject to but one effect in such cases. Let us examine a few of the criminal cases.

In *State v. Williams,* 122 Iowa 115, counsel for the State

commented on the fact that the defendant had not shown good character, and that this was sufficient evidence of bad character, and referred to one matter of which there was no sufficient evidence. The argument was held to be "evidently very prejudicial," and the case was reversed.

In *State v. Roscum*, 119 Iowa 330, the defendant was on trial for malicious mischief in pulling up some peach and apple trees. Improper questions were asked respecting a similar charge, to which objections were sustained. We said:

"Indeed, the purpose to get before the jury by indirection the fact that appellant was charged with other depredations, and thereby put him to a disadvantage in the pending trial, is too clear to admit of doubt. If convictions cannot be otherwise secured, it is far better to permit the guilty to go unpunished than to resort to expedients which are essentially unfair, and destructive of the settled rules of evidence."

In *State v. Fuller*, 142 Iowa 598, the defendant was charged with wife desertion. In argument, counsel for the State said:

"How many men are there whom you know, and whom I know, that, instead of going to a literary society and pulling John Fuller out by his coat collar, would have gone and brought him out either with a club or a gun."

Objection to this argument was sustained, and a special instruction given in regard thereto. Notwithstanding this, we held that it constituted reversible error.

*State v. Harmann*, 135 Iowa 167, was a trial for adultery, and the county attorney stated to the jury:

"Instead of trying a case of adultery here, gentlemen of the jury, you should be here for the purpose of determining whether or not Jacob Keifer was guilty of murder if he had exercised his manhood, and taken a gun or pistol and shot through the heart of Dr. Harmann."

Speaking by Mr. Justice Deemer, we said:

"There is enough of a disposition for unthinking and unreasoning persons to take the law into their own hands without having it encouraged by ministers of the law. It was the duty of the attorney who made this statement to discourage the very thing which he was countenancing, and there was no other rea-

son for making the statement than to inflame the passions and induce the jury to right a supposed wrong which a party had neglected to perform on his own behalf.''

In *State v. Giudice*, 170 Iowa 731, the reference in argument to the fact that the defendant had procured a change of venue of the trial was held to be misconduct, and argument assailing the accused by insinuation not within the evidence was held to constitute reversible error.

In *State v. Proctor*, 86 Iowa 698, the defendant was charged with the crime of seduction, and the attorney for the State argued to the jury that the prosecutrix should have sent a bullet through the defendant. We said:

''The remarks we have quoted and others of a similar character were not only objectionable, but they were of a nature to work great prejudice to the defendant. This is especially true for the reason that they were made by a representative of the State, who had expressed a just estimate of his duties, and a desire to avoid convicting the defendant unless his guilt had been proven; and for the further reason that the attorney for the defendant had no opportunity to respond to them.''

In *State v. Clouser*, 72 Iowa 302, in a trial for murder, the attorney for the State, in argument, referred to the fact that the defendant had been tried twice by a jury of twelve men, and found guilty. We said:

''Every man accused of a public offense has the right to have the independent and deliberate judgment of his triers pronounced upon the evidence adduced upon his trial.''

In *State v. Peirce*, 178 Iowa 417, where a chief of police was charged with conspiracy to protect law breakers, the county attorney enlarged upon the prevalence of all kinds of infamous crimes in the community, and the miscarriage of justice in the trial of a criminal case the year previous, and said:

''Can there be any question possible, gentlemen, of the guilt of this man of every one of these charges—how many thousands more, nobody knows.''

We held that such conduct was highly prejudicial and inflammatory, and required reversal, citing many authorities to sustain it.

In *State v. Weaver*, 182 Iowa 921, the defendant was indicted for the crime of lewd, immoral, and lascivious acts. Questions were asked of witnesses, tending to show that the defendant had been guilty of similar misconduct with them. We said, by Mr. Justice Stevens:

"The duty of the prosecuting attorney is not alone to secure a conviction of the guilty, whenever possible, but also to safeguard the rights of the accused, by closely observing the rules of evidence and prescribed procedure. While the questions were propounded with the permission of the court, upon the theory that the State should have an opportunity to make a proper record for appeal, still, on account of the character of the offense which it was claimed had been committed against the witness, and suggested by the line of questioning indicated, coupled with the fact that same was clearly inadmissible, we think same was rendered highly prejudicial to the rights of the defendant, and that it was misconduct on the part of the prosecutor to call the witness and pursue the line of questioning indicated."

In the recent case of *State v. Boyd,* 195 Iowa 1091, the misconduct had no reference whatever to the accused, but consisted of criticism of his attorney, who was a nonresident of the county. Speaking by Mr. Justice Arthur, we then said:

"But, upon reflection, we fear that the virulent attack by the county attorney, made before a jury of his own people, against a nonresident attorney, may have prejudiced the jury against appellant."

The attack upon the attorney in the *Boyd* case, which we held to be misconduct, is modest and dispassionate in comparison with the denunciation of the defendant on trial in the instant case; and yet we reversed. .

In *State v. Robinson,* 170 Iowa 267, the county attorney in argument declared, among other things, that:

"If it had been my daughter instead of Bena Runge, this man would not be on trial here, but Simon Fisher would be on trial."

The late Justice Gaynor, with the clarity and courage that characterized his opinions, said:

"One elected to the office of county attorney, to represent

the people in the prosecution of criminals, occupies a close relationship to the administration of the law and to the court, and should have no ambition beyond that laudable one to see that no guilty party escapes. But it is not for him to assume, as prosecutor, the guilt of the defendant at any stage of the proceedings. The defendant is presumed to be innocent until by the evidence he is shown to be guilty. The jury are empaneled and sworn to determine this question. Their judgment should be unbiased, unprejudiced, uninfluenced by any consideration other than the evidence submitted to them and the law given to them by the court. Appeals to the passion, prejudice, or to the jury to stand up like men and show their disapproval of the crime charged, by convicting the defendant, are unauthorized and unjustified. Jurors are but human, and respond humanly to those appeals. Called into the arena by counsel to condemn crime abstractly, and to show their manhood or lack of manhood in this manner, they are led into the trap that requires them to condemn the defendant, to vindicate themselves. This is not the spirit of our law. This is not the purpose for which arguments to the jury are permitted. This is subversive of a fair administration of public justice. It is against the law and good morals.''

In the case at bar, the argument was far more prejudicial than in the *Robinson* case. I think it was ''subversive of a fair administration of public justice.'' It was ''against the law and good morals.''

The cases might be multiplied almost without limit, on the proposition that misconduct of the very kind that occurred in the case at bar is prejudicial, and requires a reversal of the case, regardless of this court's opinion as to the guilt or innocence of the defendant. Many of them are cited in the former decisions of this court, to which I have referred. The foregoing cases illustrate that heretofore this court has not hesitated to grant a new trial for misconduct of the character complained of, in a great variety of cases, both civil and criminal. Every argument of reason and justice supports the contention that, in a case of murder in the first degree, above all others, the trial should be conducted in substantial compliance with the established rules of law.

In a case involving a few paltry dollars, we reverse if there is argument referring to a defendant corporation as being "wealthy." In a seduction case, we reverse if there is an intimation that the aggrieved person should have avenged the wrong. In a suit over the price of intoxicating liquors, we reverse for a mere suggestion that the party had grown rich selling beer and whisky. In a suit against a railroad company, we reverse for misconduct in referring to the income of the defendant. And so on, for more than seventy-five years of Iowa jurisprudence, we have, time and time again, consistently declared that misconduct of this kind was a denial of a fair and impartial trial. These decisions are right. We should not depart from them.

But now, in a case where a man is on trial for his *life*, the majority are sanctioning a line of inquiry to create in the minds of the jury a prejudice against the defendant because, being a colored man, he was on intimate terms with another man's wife, who was a white woman, where such fact, if it be true, did not have the least relevancy to the case on trial. The majority are holding that it was proper to discuss this matter in argument in the highly prejudicial and inflammatory manner shown in the record. The majority are saying that it was not improper for an attorney, in closing argument in such a case, to deliver a long discourse about the blood that had been shed in behalf of the colored race, and then denounce the defendant as being "absolutely incapable of gratitude." The majority are holding that in such a case it was legitimate argument to say to the jury that the defendant *"wasn't even supporting his wife and his three children. Now, there is the type of fellow. What right did he have?"*

But we reverse if a corporation is referred to as being "wealthy" or "soulless."

In the only case under our law where the jury is to fix the penalty, the majority say it was "nonprejudicial" to argue to the jury that the defendant *"probably feared and knew deep down in his heart that he ought to be mobbed. * * * After he had committed this murder, he went and got himself locked up in jail, so that nobody could get hold of him. * * ** The evidence

shows that he thought too much of his black hide, when he came up after committing this murder and asked to be locked up." But we reverse for a suggestion that the father of a seduced girl should have avenged the wrong. Why the distinction?

The majority declare it to be nonprejudicial and perfectly proper to tell a jury that a defendant "should be taken from society just the same as you would stamp your foot upon a rattlesnake,—upon the head of a rattlesnake;" but if a man is on trial for malicious mischief in digging up trees, we reverse because the State offered to prove that a witness lost several geese, and afterwards "saw geese exactly like them" on the farm of the defendant. I fail to recognize consistency in the two positions.

The majority hold in this case that it was proper to argue that a defendant had not entered a plea of guilty, but had stood trial. Yet we have heretofore reversed for reference to the fact that a defendant had procured a change of venue.

What shall be the rule in the future? Who may know?

Our former decisions on this question are correct and consistent. We should not depart from them now. I perceive no exigency that warrants such a heroic procedure.

The discussion might be continued, but I forego. The argument was highly improper, inflammatory, passionate, and prejudicial. It was a deliberate presentation of matters wholly extraneous, for no other purpose than to prejudice the defendant in the eyes of the jury. It was a persistent appeal to passion and prejudice. It was a flagrant denial of a "fair and impartial trial." It was "subversive of a fair administration of public justice;" it was "against law and good morals."

III. There is another proposition announced by the majority in which I cannot concur. The majority lay down the rule that, where a prosecutor is guilty of misconduct in closing argument to the jury, it is to be presumed, without any showing to the contrary, that the argument so made was a proper reply to the argument of counsel for the defendant. I do not believe such to be the correct rule. I cannot subscribe to the pronouncement that "it is presumed, nothing appearing to the contrary,

that argument by the prosecutor was a legitimate response to argument for the defendant.''

The majority say that they have no doubt that his (defendant's) counsel made the most of the fact that he (defendant) was a colored man and that he and his race had been at a disadvantage in the past. I cannot follow my associates in the line of reasoning that we are to indulge in the conjecture that counsel for the defendant made the most of the circumstances (in regard to a mob) in his argument to the jury.

I am aware of the fact that, in some of our previous decisions, there have been intimations of such a rule as is now announced. I think they are erroneous, and should be overruled on this question. The pronouncement in the instant case is contrary to the universal and generally recognized rule of the courts of this country. No authorities are cited by the majority to sustain any such a rule, except some of our previous decisions in which there is similar dictum. If any other court has adopted such an extraordinary rule, our attention has not been called to the decision. The Indiana case cited by the majority is not in point.

As I understand the true rule, prejudice is presumed from misconduct in argument, but such misconduct may be excused by a showing that it is a legitimate reply to argument by opposing counsel; and unless such showing is made, the misconduct is not excused. The majority opinion reverses completely this salutary and well established rule of practice. I observe no good reason why this should be done.

Under the rule now announced, a prosecutor may be guilty of the most flagrant misconduct in closing argument, and ''it will be presumed'' to be response to argument by defendant's counsel. The majority would place upon the defendant, under such a situation, the burden of showing that his counsel had *not* been guilty of misconduct in argument to which the prosecutor's argument was a legitimate response. In other words, we start out with the ''*presumption*'' that *defendant's* counsel has, in effect, been guilty of misconduct.

Contrary to the universal rule, the majority would place upon the *defendant* in a criminal case the burden of showing

that a prejudicial closing argument by the prosecutor was *not* in reply to argument by defendant's counsel. I do not think any such burden rests upon a defendant in such a case. My understanding of the law is that, when an improper, impassioned, and inflammatory argument is indulged in by the prosecutor, as in this case, the law presumes that prejudice follows therefrom, and if such argument is to be excused, the burden rests upon the prosecution to excuse it. The rule of the majority is simply this: That a flagrant, inflammatory, and prejudicial closing argument in a criminal case will be *"presumed"* to be in response to argument of counsel for the defendant, unless the *defendant* establishes that it was not in response to such argument. I cannot and will not subscribe to any such rule. I think it to be fundamentally and radically wrong, and directly contrary to the correct rule, recognized by every court where the question has arisen.

In this case there is not a hint or suggestion in the record that defendant's counsel indulged in anything in argument to which the improper argument of the special prosecutor was a response. The "presumption" to that effect is quite gratuitous. If the argument of counsel for the State was in reply to argument of counsel for the defendant, or was invited by him, it would have been a very simple matter to have established that fact by affidavits of jurors, bystanders, or counsel for the State, in resistance to a motion for a new trial. Not a hint of the kind appears in the record in this case. No such suggestion is claimed by the State in argument. Without any record whatever to warrant such an assumption, without any claim or argument to support it, the majority indulge in the "presumption" that the counsel for the defendant "in all probability" said something in his argument which justified the misconduct of counsel for the State in reply. I am not prepared to excuse prejudicial misconduct in a closing argument to the jury upon any such unwarranted assumption by the court as this. To lay down and adhere to any such rule makes it possible for the attorney for the prosecution to be guilty of the most flagrant misconduct in closing argument, even though the attorney for the defendant has in no way invited any such reply. To excuse proved misconduct by

a "presumption" that it was justifiable because of *assumed* and wholly unproved misconduct on the part of opposing counsel in argument, is a judicial invitation to prosecutors to trespass with impunity upon the rights of a defendant, and to seek by inflammatory appeals to wrest verdicts from a jury that are not the result of deliberate judgment. It is a generally recognized rule that one presumption cannot rest upon another presumption. Why should we abandon such a rule to fit the exigencies of any particular case or class of cases? Or why judicially *presume* transgression by *defendant's* counsel, in order to excuse misconduct by a special prosecutor?

Were I put to it, I could not "presume" any kind of an argument counsel for defendant could have indulged in, to which the argument in question would have been a legitimate reply. Are we to "presume" that defendant's counsel argued that the defendant should *not* be killed "as you would stamp on the head of a rattlesnake;" that he ought *not* "to be mobbed;" that he was *not* consorting with a white woman who was another man's wife; that he *did* "support his wife and children?"

Outside of the Iowa cases to which I have referred, the majority opinion cites and makes a partial quotation from *State v. Reed,* 141 Ind. 116 (40 N. E. 525), as sustaining the rule contended for. I do not so read the authority. In that case, appellant (the defendant) was a witness in his own behalf. The court instructed the jury in regard to certain matters testified to by appellant. Complaint was made of the instruction in regard to such evidence. The court said:

"It is not disclosed by the record that the statements of appellant to the jury were not referred to, or made use of, by his counsel in their argument in his behalf, and, as we are bound to indulge all reasonable presumptions in support of the action of the trial court, we must presume that counsel did exercise this right, and in that event it would have been proper for the court to have correctly advised the jury, under the evidence, upon the law relative to the points made by them in their argument."

I fail to see that the cited case bears any relevancy to the question in the case at bar. The rule as applicable to such a

situation as we have before us is stated in *Lowdon v. United States,* 149 Fed. 673, as follows:

"But, under the circumstances of this case, considering the character of the argument, the refusal of the trial judge to interfere at the time the objection was interposed, or to correct the probable effect of the argument by a subsequent instruction, *and because it does not appear affirmatively to us that no injury was done to the defendants,* we are constrained to hold that the judgment should be reversed, and a new trial granted to both defendants." (Italics are mine.)

That the objections in the instant case were sufficient to warrant a review of all of the statements complained of was held by us in the recent case of *State v. Boyd,* supra. See, also, *State v. Peirce,* 178 Iowa 417.

I do not care to discuss the opinion of the majority that the argument of the prosecutor "taken as a whole is not inflammatory and is not prejudicial." It speaks for itself. The analysis thereof in the majority opinion, in an endeavor to excuse the appeal to the jury to hang the defendant "just the same as you would stamp your foot upon a rattlesnake,—upon the head of a rattlesnake," and other like portions of the argument, only serves to accentuate its prejudicial character. It was "against the law and good morals."

The holding of the majority is destructive of the ancient landmarks that have stood for so many years, by which rich and poor, high and low, black and white, have been entitled to a fair and impartial determination of their rights in the courts of this state. I cannot but feel that human rights should be held to be as sacred as property rights, and that, at least in the only instance known to our law where the jury fixes the penalty and is empowered to deprive a defendant of his life, the courts should unhesitatingly see to it that a jury, in so acting, is not influenced by insinuations and suggestions against a defendant entirely outside of legitimate evidence, or by inflammatory and impassioned appeals of the character used to incite a mob. Our criminal laws should not be enforced in any such manner, nor will trials so conducted contribute to a respect for the courts as fair and impartial administrators of justice, among a thoughtful and law-

abiding citizenry. The majority would overrule a well established and salutary rule, to which I am abidingly confident the court will return in due time. I am firmly of the opinion that the case should be reversed, and a new trial ordered, in accordance with the law as repeatedly laid down by this court and many others in both civil and criminal cases where this question was involved.